**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Harold Benny JEWEL, also known as "Bear," and Arthur S. Jackson, also known as Stevie Jackson, Defendants–Appellants.**

**Nos. 90–2001, 90–2262.**

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 11, 1990.

Decided Oct. 21, 1991.

R. Jeffrey Wagner, Asst. U.S. Atty., William J. Lipscomb (argued), Asset Forfeiture Unit, Milwaukee, Wis., for U.S.

James M. Shellow, Robert R. Henak (argued), Shellow, Shellow & Glynn, Milwaukee, Wis., for Harold Benny Jewel.

Dominic Frinzi, Milwaukee, Wis., for Arthur S. Jackson.

Before COFFEY, EASTERBROOK and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

Co-defendants Harold Jewel and Arthur Stevie Jackson were tried jointly before a jury. The jury found Mr. Jewel and Mr. Jackson guilty of violating 21 U.S.C. § 846 (conspiracy to possess with intent to distribute cocaine), 18 U.S.C. § 1952 (interstate travel to facilitate unlawful activity), and 21 U.S.C. § 841(a)(1) (possession with intent to distribute cocaine). Mr. Jewel and Mr. Jackson each received concurrent sentences of thirty years, five years, and thirty years, respectively, on the three counts. In this appeal, both challenge their convictions as well as their sentences. For the reasons set forth in this opinion, we affirm their convictions but vacate their sentences and remand for resentencing.

1. To avoid any possible confusion, we note at the outset that Mr. Jewel is referred to frequently in the transcripts as "Bear," and that his name and that of his brothers is spelled "Jewell" throughout the transcripts. Mr. Jackson is referred to as "Stevie" in some places. Government informant and witness Everett Pierce at times is referred to as "Pierre," and government witness Donnell Pickens is also referred to as "Parnell" and "Kenneth Knox," the names under which he was indicted.

Citations to the consecutively paginated trial transcripts will be designated as Tr. at ——.

I

BACKGROUND

A. *Facts*

This case involves a complicated set of facts and a large number of participants and witnesses, some of whom frequently are referred to in the transcripts by their aliases.[1] We present here only those facts the reader will need to understand the case as a whole. Additional facts relevant to specific issues will be introduced when we take up those issues.

From at least April 1987 to September 1989, Mr. Jewel and Mr. Jackson were involved in narcotics trafficking in Milwaukee. One individual who often was involved in their dealings was Everett Pierce. The appellants had known Pierce since childhood. Pierce and Mr. Jackson began purchasing small quantities of cocaine from Mr. Jewel for resale in 1987. Pierce later became a supplier for, rather than only a regular customer of, the appellants. In 1989, Mr. Jackson contacted Pierce and asked him to find a source of cocaine for them. Mr. Jewel and Mr. Jackson later asked Pierce to purchase cocaine for their younger brothers, Ricky Jewel and Michael Jackson. That deal fell through because the younger brothers never showed up with the purchase money. However, on three occasions in 1989, Pierce supplied a total of three kilograms of cocaine to Mr. Jackson.

Meanwhile, in the spring of 1989, Pierce was arrested on drug charges and agreed to serve as a confidential informant for Milwaukee police officers.[2] Pierce began to assist in the investigation of the narcot-

Pierce's direct examination is in a separately paginated transcript, which we shall cite as Pierce Tr. at ——. The separately paginated transcript of the sentencing proceeding will be cited as Sentencing Tr. at ——.

2. Actually, Pierce was jailed several times on drug charges between late 1987 and 1989. In 1988, he began providing information on drug trafficking to Milwaukee police officers. He did not, however, inform on Mr. Jewel or Mr. Jackson in the beginning of his career as a confidential informant.

ics activities of Mr. Jewel and Mr. Jackson, who were living in Atlanta at the time. Under the supervision of Milwaukee Police Department Detective James Cesar and Drug Enforcement Administration (DEA) Agent Jeanne Tasch, Pierce telephoned the appellants in Atlanta, purportedly to set up a cocaine purchase. He then accompanied Detective Cesar to Atlanta in early September and began working with DEA Agent Regina Bledsoe. On September 11, 1989, Pierce and Agent Bledsoe met Mr. Jackson and a friend, Gilbert Lewis, at the Lion's Den bar. Pierce told Mr. Jackson that he had brought $100,000 to Atlanta and hoped to buy five kilograms of cocaine. Mr. Jackson indicated that he was leaving for Milwaukee the next day, but advised Pierce to contact Mr. Jewel. Pierce and Agent Bledsoe met Mr. Jewel and Lewis the next day at Bucks Underground, another Atlanta bar. Mr. Jewel told Pierce that he was out of cocaine but that he would try to arrange to have five kilograms flown from California to Milwaukee.

Pierce returned to Milwaukee, and Mr. Jewel called Donnell Pickens, a California-based drug dealer, to inform him about the five-kilogram deal.[3] Although Pickens was unable to obtain the entire amount, he flew to Milwaukee with approximately two kilograms of cocaine on September 20, 1989. The next day, Pickens was arrested when he met Pierce to deliver the cocaine. On September 26, Mr. Jewel and Mr. Jackson were arrested at separate locations in Atlanta.

### B. *District Court Proceedings*

On September 26, 1989, Mr. Jewel, Mr. Jackson, Ricky Jewel, and Pickens were named in a four-count indictment. Count One charged them with conspiracy to pos-

sess with intent to distribute in excess of five kilograms of cocaine, in violation of 21 U.S.C. § 846. The period of the charged conspiracy was January 1, 1987 to September 26, 1989. Count Two charged them with interstate travel to facilitate the attempted cocaine transaction of September 21, 1989, in violation of 18 U.S.C. § 1952. In Count Three, the four men were charged with possession with intent to distribute approximately 2.3 kilograms of cocaine on September 21, in violation of 21 U.S.C. § 841(a)(1). Count Four charged Pickens with possession with intent to distribute heroin, in violation of 21 U.S.C. § 841(a)(1). Each count also expressly charged violation of 18 U.S.C. § 2 (aiding and abetting).

Pickens agreed to plead guilty to Counts Three and Four and to testify against his coconspirators. Ricky Jewel was not arrested. In February 1990, Harold Jewel and Mr. Jackson were jointly tried in a jury trial that resulted in guilty verdicts on all three counts. Mr. Jewel and Mr. Jackson were sentenced on April 24, 1990 pursuant to the United States Sentencing Guidelines (U.S.S.G. or the guidelines).[4] Although Count One of the indictment indicated that the conspiracy had started on or about January 1, 1987, the district court concluded that the evidence did not support a finding that the conspiracy had started before April 13, 1987. Each defendant received concurrent prison terms of thirty years on each of Counts One and Three and five years on Count Two, to be followed by five years of supervised release. Mr. Jewel filed a timely appeal. The district court granted Mr. Jackson's motion to file his notice of appeal on June 1, 1990. *See* Fed. R.App.P. 4(b) (on showing of excusable neglect, district court may extend time for filing notice of appeal for up to thirty days).

---

**3.** Mr. Jewel and Mr. Jackson had been using Pickens as a supplier for some time. In late 1987 and early 1988, they twice obtained one kilogram of cocaine from Pickens. Pickens spent April 1988 to early June 1989 in jail on a parole violation. Shortly thereafter, he again began transporting cocaine to Milwaukee. Pickens made several trips from California to Milwaukee between July and September. In

Milwaukee, he supplied a total of five kilograms of cocaine to Mr. Jewel's brother Ricky. According to Pickens, the negotiations regarding these sales involved Mr. Jewel.

**4.** All citations to the guidelines are to the version in effect at the time of sentencing.

II

ANALYSIS

A. *Challenges to Convictions*

1. Admission of audiotape

■ Mr. Jewel and Mr. Jackson contend that the district court abused its discretion in admitting into evidence a partially inaudible copy of a tape recording of a conversation involving Mr. Jewel, Everett Pierce, and DEA Agent Regina Bledsoe. Even though the tape was never played in open court, the appellants submit that the tape's authenticity was never established adequately and that its admission unfairly bolstered the credibility of Agent Bledsoe's testimony.

The conversation took place on September 12, 1989 at Bucks Underground, a bar located in the Atlanta Omni Hotel. Apparently because of background noise at the bar, much of the tape was inaudible. Nonetheless, Agent Bledsoe, who secretly had recorded the conversation, testified that, to the extent the tape was audible, it accurately reflected the Bucks Underground discussion. *See* Tr. at 261. Furthermore, Pierce testified that he had listened to the tape and could hear parts of it. *See id.* at 169–70. On cross-examination by Mr. Jewel's counsel, Pierce insisted that "you can hear it where I spoke to him [Mr. Jewel] about five keys [kilograms of cocaine] and he said he would call me." *Id.* at 240. Over defense objections, the district court admitted the tape into evidence.

■ This court reviews district court evidentiary rulings under an abuse of discretion standard. *See, e.g., United States v. Degaglia*, 913 F.2d 372, 375 (7th Cir.1990). As we explained in *Degaglia*:

With specific regard to the admissibility of tape recordings, this court has noted that "the trial judge exercises broad discretion in determining whether [the government has satisfied its burden of authenticating a tape recording]. Accordingly, the trial judge's ruling on the admissibility of the tape will not be overturned on appeal absent 'extraordinary circumstances.' "

*Id.* (quoting *United States v. Faurote*, 749 F.2d 40, 43 (7th Cir.1984) (citations omitted)). There is no doubt that the testimony of Agent Bledsoe, a participant in the Bucks Underground discussion, normally would provide an adequate foundation for the admission of the tape. *See id.* at 375–76. In this case, however, the focus of the appeal regarding the disputed tape is the contention that so much of it was inaudible that the tape as a whole was unreliable. On this specific issue, the abuse of discretion standard again applies: "We have noted that, '[g]enerally, tape recordings which are only partially unintelligible are admissible unless the recording as a whole is rendered untrustworthy by the unintelligible portions.' " *Id.* at 378 (quoting *United States v. Camargo*, 908 F.2d 179, 183 (7th Cir.1990)).

■ We have reviewed the tape and the colloquy between the district court and counsel with respect to its admissibility. We cannot say that the district court abused its discretion in admitting the tape. There was ample testimony that the tape, inasmuch as it is audible, accurately reflected the conversation in the bar on the night in question. Moreover, on the basis of our own review of the tape, we believe it is somewhat corroborative of the testimony of Agent Bledsoe.[5]

5. Mr. Jewel also challenges as irrelevant and unfairly prejudicial certain testimony by Pierce. Pierce testified that defendant's brother Ronnie Jewel had helped to introduce him to drug trafficking when Pierce was sixteen years old. Mr. Jewel contends that Pierce's testimony on his introduction to drug trafficking bore no relevance to any issue in the case and that the jury was prejudiced against him because jurors learned that his brother had involved a minor in illegal drug activities.

We need not determine .whether the challenged testimony meets the broad definition of presumptively relevant evidence, *see* Fed. R.Evid. 401, nor whether its probative value was substantially outweighed by its prejudicial effect, *see* Fed.R.Evid. 403, because we conclude that any possible error was harmless. *See* Fed. R.Crim.P. 52(a); *see also United States v. McClain*, 934 F.2d 822, 834 (7th Cir.1991) ("even if we were to find any abuse of discretion in this [Rule 403] balancing, ... any prejudice that might have resulted from the admission of this

## 2. Prosecutor's closing argument

██ Both appellants contend that the prosecution's rebuttal argument unfairly prejudiced their right to a fair trial by presenting facts not in evidence. The challenged statement proposed an explanation of an apparent discrepancy between testimony about a critical three-way telephone call that Mr. Jewel allegedly had placed and telephone toll records that showed no such call. The date of the call was September 21, 1989. At that time, Mr. Jewel was in Atlanta, Pierce was in Milwaukee, and Pickens had arrived in Milwaukee from California with cocaine. The call concerned plans for delivery of the cocaine. The appellants argue that both Pierce and Pickens testified that Mr. Jewel had originated the three-way call. However, telephone records presented at the trial included no such call from Mr. Jewel's Atlanta number to Pierce in Milwaukee.

DEA Agent Jeanne Tasch was confronted with the absence of the Atlanta-to-Milwaukee call when she testified about these records. She responded that the call might have been charged to the number from which Pickens was calling in Milwaukee if he initiated the call, even if the Atlanta-to-Milwaukee leg then had been placed by Mr. Jewel: "Well, I don't know that when you make a calling card call to one number and they three way it to another number, I don't know that that would appear on this 404 [Atlanta's area code] telephone bill." Tr. at 507–08. Mr. Jewel's counsel again pointed out the alleged discrepancy during his closing argument and suggested that the prosecution would offer the jury "an explanation" to respond to his remarks on this issue. *Id.* at 621.

In his rebuttal, Assistant United States Attorney (AUSA) William Lipscomb attempted to explain this "troubling fact":

> The question is how if we have this call from Pickens to L.A., Pickens to Atlanta to Harold Jewell, does the, does the three way not show up on the toll records? Well, think about it. You'll see the two calls, who placed them, Pickens placed the calls from Milwaukee. Where was Everett Pierce? Milwaukee. That, folks just plain and simple ain't long distance.

*Id.* at 647. The district court overruled an objection to this statement and reminded the jury that "the arguments, statements of counsel are not evidence in the case." *Id.* The court also denied a motion for a mistrial based on the same statement.

██ When prosecutorial statements are challenged as based on facts not in evidence, we review them under the two-part test in *United States v. Swiatek*, 819 F.2d 721 (7th Cir.), *cert. denied*, 484 U.S. 903, 108 S.Ct. 245, 98 L.Ed.2d 203 (1987):

> First, we determine whether, considered in isolation, the challenged remark was improper. If so, we reexamine the improper remark in light of the entire record to determine whether the remark deprived the defendant of a fair trial. As part of this second step, we consider whether and to what extent the improper remark was provoked by the defense counsel's argument—the so-called "invited response" doctrine.

*Id.* at 730 (citing *United States v. Torres*, 809 F.2d 429, 445–46 (7th Cir.1987) (Flaum, J., concurring)).[6] Applying this test, we find no reversible error in this case.

Taken literally, AUSA Lipscomb's assertion that "Pickens placed the calls from Milwaukee" is not supported clearly by tes-

---

evidence was doubtless harmless"). The jury heard extensive, detailed testimony about Mr. Jewel's own activities during the period of the charged conspiracy and substantive offenses. We are convinced—firmly—that Mr. Jewel's conviction is not based on a brief reference to alleged earlier illegal actions of his brother.

Mr. Jewel contends, however, that the government has waived reliance on the harmless error rule by failing to raise that issue in its brief. This court did hold recently that a harmless error argument may be waived. *See United*

*States v. Giovannetti*, 928 F.2d 225, 226 (7th Cir.1991). However, the court also held that "we have discretion to overlook a failure to argue harmlessness...." *Id.* at 227. A major factor that affects our exercise of that discretion is the certainty of the harmlessness in this case. *See id.*

6. *Accord United States v. Auerbach*, 913 F.2d 407, 417 (7th Cir.1990); *see also United States v. Rodriguez*, 925 F.2d 1049, 1055 (7th Cir.1991).

timony in the record. However, his challenged statement may have been nothing more than a somewhat inartful restatement of Agent Tasch's theory.[7] As such, it may have been "sufficiently inferable from the evidence presented to support the prosecutor's closing arguments." *United States v. Doyle*, 771 F.2d 250, 258 (7th Cir.1985); *see also United States v. Auerbach*, 913 F.2d 407, 418 (7th Cir.1990) ("the prosecutor's statements were simply a permissible comment upon what the evidence showed and not a statement of his personal opinion regarding the defendant's guilt").

Even if we agreed with the appellants that the challenged remark was improper, we would not find this error reversible. The district court appropriately cautioned the jury that closing arguments by counsel are not evidence. Such a cautionary instruction minimized any potential prejudice from AUSA Lipscomb's remarks. *See United States v. Gonzalez*, 933 F.2d 417, 431 (7th Cir.1991); *United States v. Rodriguez*, 925 F.2d 1049, 1056 n. 13 (7th Cir. 1991). We find it significant that AUSA Lipscomb told the jury that, "even if I couldn't stand up here and come up with a reasonable explanation [of the three-way call], one that makes perfect sense, so what? So what. Does that mean that all the other evidence you heard in this case doesn't add up, doesn't make any sense?" Tr. at 648. We conclude that the jury was alerted sufficiently to the discrepancy in the evidence and to its responsibility to sort out that discrepancy on the basis of evidence presented by witnesses rather than by counsel.

### 3. Sufficiency of evidence

■ Mr. Jackson contends that the government failed to present sufficient evidence for a rational jury to find beyond a reasonable doubt that he was guilty on the interstate travel and possession with intent to distribute counts (Counts Two and Three). He emphasizes one part of Agent Bledsoe's testimony that purports to establish that he was not involved in planning the September 21, 1989 deal involving Mr. Jewel, Pierce, and Pickens. On September 11, 1989, Agent Bledsoe met with Pierce and Mr. Jackson at the Lion's Den, a bar in Atlanta's Omni Hotel. During that conversation, Mr. Jackson advised Pierce to contact Mr. Jewel about the cocaine. However, Agent Bledsoe testified as follows about her meeting with Pierce and Mr. Jewel the next day at Bucks Underground:

> [T]he conversation started when Everett Pierce asked Mr. Jewell if Stevie [Mr. Jackson] had given him the message that he had given Stevie the night prior, and Mr. Jewell stated that Stevie had not. He said that Stevie came in but, and he knew that Everett Pierce was there basically because we had talked on the phone but he stated that Stevie hadn't actually said anything about what Mr. Pierce was there for.

Tr. at 258. Mr. Jackson thus asks this court to conclude that he had nothing to do with the plans that later developed involving Pickens.

■ The standard of review in sufficiency of evidence challenges is well estab-

---

7. On direct examination, Pierce testified that he was at his uncle's house in Milwaukee when Mr. Jewel "called me with Parnell [Pickens] on the telephone." Pierce Tr. at 115. However, on cross-examination, Pierce's testimony was somewhat more ambiguous:

> A I know *they called* twice and on one of the occasions he was on the phone and asked for my, the address to where I was staying.
> Q By he you're talking about Parnell?
> A Parnell and Jewell were on the phone at the same time.

Tr. at 178 (emphasis supplied). Pickens' testimony about the three-way call suggests that it occurred either during or just after he placed a call to Mr. Jewel in Atlanta:

> A ... I just looked [his Atlanta number] up and called him up and told him that I was, I was here in Milwaukee.
> Q Okay. Did you make any arrangement with him as to what to do with the two kilos at that point?
> A Well, he, that's when he called, he called Pierre [Pierce] on a three way.

*Id.* at 390. Similarly, on cross-examination, Pickens indicated that he called Mr. Jewel "and told him that I was here in Milwaukee and he got Pierre on the three way telephone and we talked." *Id.* at 425. This testimony was consistent with Agent Tasch's theory that Mr. Jewel had placed the call to Pierce *while* he was still connected to Pickens, who had placed the call to Mr. Jewel from Milwaukee.

lished: "The test is whether, after viewing the evidence in the light most favorable to the government, *'any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Pritchard,* 745 F.2d 1112, 1122 (7th Cir.1984) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original)).[8] Unless testimony is "inherently unbelievable," a guilty verdict may be based on the testimony of a coconspirator testifying pursuant to a plea agreement: "Credibility is for the jury, not this court, to determine." *United States v. Mejia,* 909 F.2d 242, 245 (7th Cir.1990).

■ Before turning to each of the challenged substantive counts, we note that Mr. Jackson does not challenge the sufficiency of the evidence on the conspiracy count. In that count, he was indicted along with Mr. Jewel, Ricky Jewel, and Pickens. Under the doctrine of vicarious coconspirator liability, a member of a continuing conspiracy is responsible for the criminal acts committed by his coconspirators in furtherance of the conspiracy. *See Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946); *United States v. Moya–Gomez,* 860 F.2d 706, 755 & n. 48 (7th Cir.1988), *cert. denied,* 492 U.S. 908, 109 S.Ct. 3221, 106 L.Ed.2d 571 (1989). Therefore, as long as the government presented sufficient evidence to prove that any one of the coconspirators committed the substantive crimes charged in Counts Two and Three, Mr. Jackson's sufficiency challenge must fail.

In Count Two, Mr. Jackson and his co-conspirators were charged with violating, or aiding and abetting a violation of, 18 U.S.C. § 1952. Prior to its amendment in 1990,[9] section 1952 read in pertinent part:

(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

(1) distribute the proceeds of any unlawful activity; or

(2) commit any crime of violence to further any unlawful activity; or

(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

18 U.S.C. § 1952(a).

In this case, Pickens testified that he contacted both Mr. Jackson and Mr. Jewel in Atlanta just weeks before the September 1989 transactions and discussed plans to travel to Milwaukee to sell cocaine. According to Agent Bledsoe, on September 11, 1989, Mr. Jackson advised Pierce to contact Mr. Jewel about the five kilograms Pierce wished to obtain. Thus, the jury could have inferred that Mr. Jackson was involved in initiating the deal even if he did not tell Mr. Jewel exactly why Pierce was trying to contact him. The jury also heard testimony from Pickens that, about a week before he flew from Los Angeles to Milwaukee, Mr. Jewel called him to say "that he had a deal for five keys [kilograms]." Tr. at 387. Although Pickens was unable to obtain the entire five kilograms, he did travel to Milwaukee with over two kilograms of cocaine later that week. When Pickens met with Pierce to transfer the cocaine, Pickens was arrested.[10] Thus, there was sufficient evidence that Pickens himself had violated section 1952 and that this criminal activity was in furtherance of an ongoing conspiracy with which Mr. Jackson was associated. Similarly, the tes-

**8.** *Accord United States v. Lamon,* 930 F.2d 1183, 1190 (7th Cir.1991).

**9.** As relevant to this appeal, the 1990 amendments did not change section 1952 substantively. *See* Crime Control Act of 1990, Pub.L. No. 101–647, §§ 1205(i), 1604, 104 Stat. 4789, 4831, 4843.

**10.** In regard to the arrest, the jury did not have to rely on Pickens' testimony. Milwaukee County Sheriff's Department Detective Mary Sage testified that she was present at his arrest and that she took possession of the cocaine seized at his hotel room.

timony about these activities is sufficient to have permitted the jury to conclude that Pickens possessed the seized cocaine with intent to distribute, the crime charged in Count Three. Thus, under the *Pinkerton* doctrine, the jury properly could have convicted Mr. Jackson on both Counts Two and Three.

## B. *Challenges to Sentences*

The district court conducted a day-long sentencing proceeding on April 24, 1990. The court determined that the base offense level for each defendant was 34. After the government put on witnesses to support its contention that Mr. Jewel had threatened Everett Pierce twice in the days just after Pickens' Milwaukee arrest and just before

Mr. Jewel's Atlanta arrest, the court enhanced Mr. Jewel's offense level two levels for obstruction of justice. In addition, each defendant's offense level was enhanced two levels for his role in the offense and two levels for possession of a firearm, resulting in an adjusted offense level of 40 for Mr. Jewel and 38 for Mr. Jackson. The court calculated Mr. Jewel's criminal history category to be III and Mr. Jackson's to be IV. The sentencing range for Mr. Jewel thus was 360 months to life, and the range for Mr. Jackson was 324–405 months. Each was sentenced to 360 months.

In this appeal, both Mr. Jewel and Mr. Jackson challenge the district court's calculation of their base offense level.[11] Both also challenge their role in the offense en-

11. Both defendants also contend that the district court erred in receiving for sentencing purposes a videotape that portrayed Mr. Jewel and Mr. Jackson at a party in January 1988 wearing a "lavish display of jewelry." Sentencing Tr. at 114. The videotape had been seized pursuant to a forfeiture warrant. Mr. Jewel contends that, even if the seizure of the videotape was legal, "viewing the videotape constituted an independent search unauthorized by the warrant, probable cause, or the plain view doctrine." Appellant Jewel's Br. at 32 n. 8. The district court held that the exclusionary rule does not apply to sentencing proceedings. *See* Sentencing Tr. at 22. The court reasoned that application of the exclusionary rule at sentencing would have little deterrent effect. *Id.*

Because we are remanding this case for resentencing, we need not resolve this issue. The record is not sufficiently developed, especially on the question of whether Mr. Jackson has standing to object to the admission of the videotape. We note, however, that several courts have rejected a blanket rule that the exclusionary rule never applies at sentencing. *See Verdugo v. United States*, 402 F.2d 599, 611 (9th Cir. 1968) ("It cannot be supposed, for example, that the court could properly consider evidence illegally seized after conviction from the accused's home by narcotics agents or by the probation officer in a zealous but misguided effort to furnish the court with full information for sentencing."), *cert. denied*, 397 U.S. 925, 90 S.Ct. 931, 25 L.Ed.2d 105 (1970), and 402 U.S. 961, 91 S.Ct. 1623, 29 L.Ed.2d 124 (1971); *United States v. Cabrera*, 756 F.Supp. 134, 135–36 (S.D.N.Y.1991) (guidelines provide authorities with incentive to conduct illegal searches even if items seized cannot be used to prove guilt); *cf. United States v. McCrory*, 930 F.2d 63, 69 (D.C.Cir.1991) ("Where there is no showing of a violation of the Fourth Amendment purposefully designed to obtain evidence to increase a

defendant's base offense level at sentencing, this police misconduct is not sufficient to justify interfering with individualized sentencing.... [W]e leave open the question whether suppression would be necessary and proper at the sentencing phase where it is shown that the police acted egregiously, *e.g.*, by undertaking a warrantless search for the very purpose of obtaining evidence to increase a defendant's sentence."); *id.* at 71 (Silberman, J., concurring in part and concurring in the judgment) (expressing concern that, under guidelines, "[i]f the police and prosecution know beforehand that they can get a conviction on a relatively minor offense which has a broad statutory sentencing range and that they can guarantee a sentence near the maximum by seizing other evidence illegally and introducing it at sentencing, there is nothing to deter them from seizing the evidence immediately without obtaining a warrant, especially when a conviction on a 'greater' crime would lead to a similar sentence."); *United States v. Torres*, 926 F.2d 321, 325 (3d Cir. 1991) (refusing to apply exclusionary rule at sentencing to evidence seized illegally but noting that, unlike in *Verdugo*, "the record [did not show] that evidence was illegally seized for the purpose of enhancing the sentence"). Neither the *McCrory* court nor the *Torres* court completely foreclosed the possibility of applying the exclusionary rule at sentencing in a suitable case, even though 18 U.S.C. § 3661 states that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." *See also* U.S.S.G. § 1B1.4 ("In determining the sentence to impose ... the court may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law.").

hancement. In addition, Mr. Jewel challenges the court's imposition of a two-level enhancement for obstruction of justice. Neither appellant contests his firearm enhancement or his criminal history category.

### 1. Base offense level

█ Under the guidelines, the base offense level for drug offenses is determined by the type and quantity of drug involved in the offense. *See* U.S.S.G. § 2D1.1(a)(3), (c). When convicted of conspiracy, a defendant is assigned a base offense level that is "the same as if the object of the conspiracy ... had been completed." *Id.* § 2D1.4. Amounts negotiated but not distributed are to be counted unless "the court finds that the defendant did not intend to produce and was not reasonably capable of producing the negotiated amount...." *Id.* § 2D1.4 *Application Note* 1.[12] In addition, the guidelines recognize that a defendant involved in a conspiracy or other "jointly-undertaken criminal activity" can be held responsible for the "conduct of others in furtherance of the execution of the jointly-undertaken criminal activity that was reasonably foreseeable by the defendant.... Where it is established that the conduct was neither within the scope of the defendant's agreement, nor was reasonably foreseeable in connection with the criminal activity the defendant agreed to jointly undertake, such conduct is not included in establishing the defendant's offense level...." *Id.* § 1B1.3 *Application Note* 1. We review for clear error district court factual determinations of the amount of narcotics involved. *See, e.g., United States v. Ocampo*, 890 F.2d 1363, 1372 (7th Cir. 1989).

█ According to the presentence report in this case, Mr. Jewel and Mr. Jackson each was responsible for twenty-four kilograms of cocaine, resulting in a proposed base offense level of 34. *See* U.S.S.G. § 2D1.1(c)(5) (at least fifteen but less than fifty kilograms of cocaine). During the sentencing proceeding, the defendants contended that evidence regarding a number of the underlying transactions con-

sisted of little more than the uncorroborated and unreliable testimony of Pierce. They also argued that some of these transactions, including four kilograms allegedly delivered to Mr. Jewel in 1987 by Elroy Chaney, were not part of the charged conspiracy. In addition, they argued that it was improper to include three kilograms supplied by Pierce in 1989, allegedly after he began serving as a government informant. Finally, they challenged inclusion of approximately 6.5 kilograms that allegedly were the subject of preliminary discussions but that never were delivered either because a member of the conspiracy could not produce such amounts or could not raise the money to pay for the cocaine. In all, Mr. Jewel and Mr. Jackson raised specific objections to inclusion of approximately 13.5 kilograms. Had the district court sustained all these objections and hence found them responsible for only 11.5 kilograms, their base offense level would have been 32. *See id.* § 2D1.1(c)(6) (at least five but less than fifteen kilograms of cocaine).

Without ruling on each specific objection, the district court reached the following conclusions on the base offense level:

> It easily becomes a 34 case if there's 15 or more kilos of cocaine involved. And based on the evidence presented in the trial, the testimony of Mr. Pierce, the lavish display of jewelry and so on from the videos, the discussions with the DEA agents, undercover agent, it is quite obvious to me that—and, again, I'm not required here to work for the bureau of weights and measures and come up with the precise exact amount of drugs involved in these kinds of cases. I'm supposed to do my best to pick out, I believe, a general area of responsibility. And I think that area of responsibility properly lies in level 34, between the 15 to 50 kilo category. So as to each defendant, and I'm not going to go through each allegation, but I find that the evidence supports a finding of responsibility within or quantity within the offense level 34.

Sentencing Tr. at 114.

Despite our recognition of the deferential standard of review appropriate on this is-

---

**12.** *See also United States v. Buggs,* 904 F.2d 1070, 1078–79 (7th Cir.1990) (citing cases).

sue—as well as our appreciation for the considerable care and effort undertaken by the district court in conducting a lengthy sentencing proceeding—we must vacate the sentences of both Mr. Jewel and Mr. Jackson and remand for resentencing. The district court's refusal "to go through each allegation" was inconsistent with the court's obligation under Federal Rule of Criminal Procedure 32(c)(3)(D) to respond to each specific objection to a presentence report. This rule requires that, when defendants "allege any factual inaccuracy in the presentence investigation report or the summary of the report or part thereof, the court shall, as to each matter controverted, make (i) a finding as to the allegation, or (ii) a determination that no such finding is necessary because the matter controverted will not be taken into account in sentencing." Fed.R.Crim.P. 32(c)(3)(D). As this court made clear in *United States v. Eschweiler*, 782 F.2d 1385, 1389 (7th Cir. 1986),

> all a defendant needs to show in order to be resentenced for a violation of Rule 32(c)(3)(D) is that (1) allegations of inaccuracy were before the sentencing court and (2) the court failed to make findings regarding the controverted matters or a determination that the disputed information would not be used in sentencing.[13]

It is uncontroverted that Mr. Jewel and Mr. Jackson triggered the protections of Rule 32(c)(3)(D) by raising specific objections to the presentencing report. The district court, however, refused to make a specific finding on each objection, nor did it make sufficiently clear that it was not relying on the disputed information in determining the base offense level of each defendant.

Under the guidelines, it is the responsibility of the district court "to resolve the purely factual questions of how much [cocaine] was involved in each actual or proposed transaction." *United States v. Buggs*, 904 F.2d 1070, 1079 (7th Cir.1990). In this case, the district court's general conclusion that Mr. Jewel and Mr. Jackson were responsible for between fifteen and fifty kilograms of cocaine makes meaningful appellate review impossible.[14] For example, one of the alleged two-kilogram deliveries from Chaney to Mr. Jewel occurred, according to Pierce, early in 1987. Because the district court found that the conspiracy started only in mid-April 1987, it is unclear whether the court included that transaction.[15] Similarly, our review of the sentencing proceeding leaves us uncertain whether the district court included any of the amounts delivered by Pierce in 1989, allegedly after he had become a government informant. In addition, although negotiated but undelivered amounts of illegal drugs *generally* should be counted in determining the base offense level, it is the responsibility of the district court in the first instance to distinguish between true negotiations and idle talk.[16] We therefore

---

**13.** *Accord United States v. Montoya*, 891 F.2d 1273, 1279 (7th Cir.1989); *see also United States v. Stout*, 882 F.2d 270, 272 (7th Cir.1989) ("The procedures set forth in Rule 32(c)(3)(D) are mandatory, not discretionary, and our court has been reluctant to characterize any violations of the rule as harmless.") (citations omitted); *cf. United States v. Slaughter*, 900 F.2d 1119, 1123 (7th Cir.1990) (rejecting Rule 32 challenge when district court made sufficiently clear that disputed facts would not affect sentence; district court stated that resolution of all contested issues in the defendant's favor would not alter its decision to impose maximum sentence).

**14.** In *United States v. Sullivan*, 916 F.2d 417 (7th Cir.1990), this court vacated and remanded for resentencing because the district court had provided inadequate explanation of why it denied the appellant a two-point reduction for acceptance of responsibility under U.S.S.G. § 3E1.1. We remanded in that case even though we were

"convinced that there is other evidence in the record that the district court could have relied on to deny the two-point reduction." 916 F.2d at 420. As we noted in *Sullivan*, "it is incumbent upon the trial court to provide an explanation of the factors it relied on in reaching its decision to enable this Court to fulfill its review function." *Id.*

**15.** *Cf. United States v. White*, 888 F.2d 490, 500 (7th Cir.1989) (vacating sentence based on amounts relating to charged 1986 conspiracy and 1988 sale and negotiation because conspiracy was not part of a common scheme or course of conduct with 1988 offenses and district court failed to find that the two 1988 offenses were related).

**16.** In *United States v. Ruiz*, 932 F.2d 1174, 1184 (7th Cir.1991), this court indicated that, although a sentencing court should consider nego-

vacate both appellants' sentences and remand to give the district court the opportunity to clarify which of the challenged transactions it considered in estimating the amount of cocaine involved in the offenses.

### 2. Role in the offense enhancement

 The presentence report recommended a three-level enhancement for each defendant for his alleged managerial role in the offense. The report indicated that the conspiracy consisted of eight persons: the defendants, Pickens, Pierce, Ricky Jewel, Michael Jackson, Gilbert Lewis, and Jeanine Walker (Mr. Jewel's girlfriend). The district court indicated some skepticism that some of these individuals had been managed by the defendants: "As to the role in the offense, my view is that many of these people involved in this case were people who didn't need anybody to lead them around and encourage them to get involved in this activity." Sentencing Tr. at 117. The court thus rejected the proposed three-level enhancement, but imposed a two-level enhancement for each defendant under U.S.S.G. § 3B1.1(c), which authorizes an enhancement for "an organizer, leader, manager, or supervisor in any criminal activity" that does not involve five or more participants or is not "otherwise extensive." [17]

Mr. Jewel and Mr. Jackson contend that the district court failed to support its findings on this enhancement with sufficient specificity and that the findings are clearly erroneous. They argue that the individuals cited in the presentence report were either "co-equal participant[s] in the conspiracy" or, in the case of Walker and Lewis, not

participants at all. Appellant Jewel's Br. at 45.

 Absent a contention that the district court has misconstrued the guidelines, we review the court's enhancements under section 3B1.1 for clear error. *See, e.g., United States v. Ruiz,* 932 F.2d 1174, 1183 (7th Cir.1991). Section 3B1.1 is applicable to offenses involving more than one participant, but a role in the offense enhancement need not be applied in every such case. *See* U.S.S.G. Ch. 3, Pt. B *Introductory Commentary.* At the same time, "[t]here can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." *Id.* § 3B1.1 *Application Note* 3. The *Background Commentary* to this section indicates that the Sentencing "Commission's intent is that this adjustment should increase with both the size of the organization and the degree of the defendant's responsibility."

 The district court approved the two-level enhancement rather than the recommended three-level enhancement, but gave no indication which of the alleged participants each defendant had supervised. It also remarked, as we already have noted, that at least some of the coconspirators could not be characterized as followers of anyone. Under these circumstances, we must conclude that the district court left unclear the "evidentiary basis for [its] sentencing determination." *United States v. Hernandez,* 931 F.2d 16, 18 n. 2 (7th Cir.1991) (per curiam). There may be an adequate basis in the record to support the conclusion that Mr. Jewel and Mr. Jackson each supervised at least one other par-

---

tiated amounts when the defendant "actually arranged the details of a drug sale (e.g., price, quantity, location)," it should not consider "an offhand statement referring to larger quantities of narcotics that amounts to no more than braggadocio."

**17.** U.S.S.G. § 3B1.1 provides:
 Based on the defendant's role in the offense, increase the offense level as follows:
 (a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.

 (b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.
 (c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.
*Application Note* 1 defines "participant" as "a person who is criminally responsible for the commission of the offense, but need not have been convicted."

ticipant. However, on this record, we cannot be sure that the district court focused on the matter with sufficient precision.[18] Given the statements in the record, we believe that it would be appropriate for the district court to address the matter in the first instance. We continue to encourage district courts to support findings of facts in sentencing proceedings with subsidiary findings both to "aid the district court in identifying relevant factors in applying the Guidelines and guide the reviewing court to the evidentiary basis for a sentencing determination." *Id.* (citing cases); *see also United States v. Lanese*, 890 F.2d 1284, 1294 (2d Cir.1989) ("Since, on the record before this court, it is unclear whether there is sufficient evidence to support the district court's determination as to the number of 'participants,' for purposes of section 3B1.1(b), we remand to the district court for a specific finding as to the identities of the 'participants.' "), *cert. denied*, —— U.S. ——, 110 S.Ct. 2207, 109 L.Ed.2d 533 (1990).

### 3. Obstruction of justice enhancement

■ Finally, Mr. Jewel contends that the district court erred in enhancing his offense level for obstruction of justice under U.S.S.G. § 3C1.1. Specifically, he argues that the court based the enhancement on unreliable and uncorroborated hearsay

evidence presented at the sentencing proceeding. Detective James Cesar testified at the proceeding that, on September 25, 1989, he received a call from Pierce, who had been serving as his confidential informant and had assisted in setting up the sting that had led to Pickens' arrest four days earlier. During that call, Pierce reported that Mr. Jewel had called him from Atlanta and asked "whether or not he was the person who was responsible for indictments that were going to, that were brought down.[19] And he stated that at that time this person indicating to him that something could happen to him like happened to Porter Magee." Sentencing Tr. at 29. Magee had been murdered in early 1989. Detective Cesar also testified that Pierce called him again on September 26 to report that he had received another call—this one from either Mr. Jewel or Mr. Jackson—threatening both Pierce and his attorney, John McNally. According to Detective Cesar, Pierce also had told McNally about that second threat. Less than one week later, on October 1, 1989, Pierce was shot at by Cleveland Jeans after Jeans accused Pierce of being a "snitch." *Id.* at 32.

Neither Pierce nor McNally testified at the sentencing hearing about the alleged threats. Moreover, the government presented no evidence that Mr. Jewel had

---

**18.** The government contends that the record supports the conclusion that Mr. Jewel supervised Mr. Jackson as well as Ricky Jewel and Pickens. Similarly, the government argues that there is evidence that Mr. Jackson supervised Ricky Jewel, Michael Jackson, and Pierce. If the record indicated that the district court had given the matter sufficient focused attention and we were to conclude, as the government submits, that the record would have permitted a finding by the district court that a 3B1.1(c) enhancement was appropriate, we could affirm on the point without further proceedings. *See United States v. Lamon*, 930 F.2d 1183, 1193 n. 26 (7th Cir.1991); *see also United States v. Beverly*, 913 F.2d 337, 361–65 (7th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 766, 112 L.Ed.2d 786 (1991), and *cert. granted sub nom. Griffin v. United States*, —— U.S. ——, 111 S.Ct. 951, 112 L.Ed.2d 1039 (1991); *United States v. Holguin*, 868 F.2d 201, 203 (7th Cir.), *cert. denied*, 493 U.S. 829, 110 S.Ct. 97, 107 L.Ed.2d 60 (1989). We note that Pierce cannot be considered a participant for the period during which he was

serving as a government informant. *See United States v. DeCicco*, 899 F.2d 1531, 1535 (7th Cir. 1990) (holding that section 3B1.1 applies "only to situations where the offender organizes or leads criminally responsible individuals"); *United States v. Carroll*, 893 F.2d 1502, 1506–09 (6th Cir.1990) (rejecting application of section 3B1.1(c) because only individuals other than defendant involved in offense were government agents). We do not decide whether the record supports a conclusion that Pierce was supervised by Mr. Jackson during the period of the conspiracy *before* Pierce became an informant. This entire matter ought to be resolved in the first instance by the district court.

**19.** Although the indictment was not handed down until September 26, after Mr. Jewel allegedly made the first threat, an arrest warrant had been issued and a criminal complaint had been filed against him on September 22, the day after Pickens' arrest. Mr. Jewel was arrested on September 26.

called Pierce from Atlanta on the days in question. Nor did it present evidence to link Jeans to either Mr. Jewel or Mr. Jackson. Finally, during cross-examination of Detective Cesar, it was established that Pierce had reported the second threat only after he himself had been arrested on weapons and narcotics charges. The district court determined that there was inadequate evidence to support an obstruction enhancement of Mr. Jackson's offense level. However, the court overruled Mr. Jewel's objection to the proposed enhancement:

> I believe the testimony regarding threats directed in the general direction of Mr. Pierce, a witness, the close timing to reported threats to the arrest of Mr. Jewell, the testimony about snitches or remember what happened to Porter Magee, those kind of activities, and the report from Attorney John McNally
>
> . . . .

*Id.* at 118.

■ At the time of Mr. Jewel's sentencing, the guidelines provided: "If the defendant willfully impeded or obstructed, or attempted to impede or obstruct the administration of justice during the investigation or prosecution of the instant offense, increase the offense level by two levels." U.S.S.G. § 3C1.1. One basis for triggering application of this enhancement is "threatening, intimidating, or otherwise unlawfully attempting to influence a co-defendant, witness, or juror, directly or indirectly." *Id.* § 3C1.1 *Application Note* 1(d). As Mr. Jewel recognizes, the rules of evidence do not apply to sentencing proceedings,[20] and "[r]eliable hearsay evidence may be considered." *Id.* § 6A1.3 *Commentary.*[21] " 'As part of th[e] broad [sentencing] inquiry, the trial judge is permitted to consider ... hearsay evidence' if he or she determines that the evidence is reliable and provides the defendant opportunity to rebut that evidence." *United States v. Hubbard,* 929 F.2d 307, 309–10 (7th Cir.1991) (quoting *United States v. Nowicki,* 870 F.2d 405, 407 (1989)).[22] The district court's evaluation of reliability is reviewed under an abuse of discretion standard, *see id.* at 310, and the district court's factual findings regarding section 3C1.1 enhancements are reviewed under a clearly erroneous standard. *See United States v. Lozoya–Morales,* 931 F.2d 1216, 1218 (7th Cir.1991).

---

20. *See* Fed.R.Evid. 1101(d)(3) (except for rules regarding privileges, Federal Rules of Evidence are inapplicable at sentencing proceedings); *see also United States v. Leung,* 929 F.2d 1204, 1209 (7th Cir.1991) (citing Rule 1101(d)(3)).

21. *See also United States v. Miller,* 891 F.2d 1265, 1270 (7th Cir.1989) (under the guidelines, "it remains our rule that 'so long as the information which the sentencing judge considers has sufficient indicia of reliability to support its probable accuracy, the information may properly be taken into account in passing sentence[ ]' ") (quoting *United States v. Marshall,* 519 F.Supp. 751, 754 (D.Wis.1981), *aff'd,* 719 F.2d 887 (7th Cir.1983)); *United States v. Aymelek,* 926 F.2d 64, 68 (1st Cir.1991) (reliable hearsay may be considered at sentencing); *United States v. Inigo,* 925 F.2d 641, 660 (3d Cir.1991) (same); *United States v. Prescott,* 920 F.2d 139, 143–45 (2d Cir.1990) (same); *cf. United States v. Barnes,* 907 F.2d 693, 696–97 (7th Cir.1990) (remanding for resentencing because district court may have relied on confidential informant's hearsay statements without giving defendant opportunity to challenge their accuracy); *United States v. Townley,* 929 F.2d 365, 370–71 (8th Cir.1991) (remanding for resentencing because district court relied on uncorroborated, unreliable hearsay); *United States v. Lowrimore,* 923 F.2d 590, 594 (8th Cir.) ("Hearsay statements used against a defendant at sentencing, over the defendant's objection, violate the Confrontation Clause unless the statements are within well-recognized exceptions to the hearsay rule, or unless the court makes a finding that the statements are otherwise especially reliable."), *cert. denied,* —— U.S. ——, 111 S.Ct. 2018, 114 L.Ed.2d 105 (1991); *United States v. Cammisano,* 917 F.2d 1057, 1062 (8th Cir.1990) (remanding for resentencing because hearsay testimony based on reports of two confidential informants insufficient to sustain upward departure); *United States v. Fortier,* 911 F.2d 100, 103 (8th Cir. 1990) ("The rules of evidence do not apply at sentencing, but the Confrontation Clause ... does apply.... [H]earsay statements admitted against a defendant do violate the Confrontation Clause unless a court finds that the declarant is unavailable and that there are indicia of reliability supporting the truthfulness of the hearsay statements.").

22. *Accord United States v. Query,* 928 F.2d 383, 385 (11th Cir.1991); *United States v. Bowman,* 926 F.2d 380, 381 (4th Cir.1991); *United States v. Beaulieu,* 893 F.2d 1177, 1179 (10th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 3302, 111 L.Ed.2d 811 (1990).

The enhancement in Mr. Jewel's case is not the result of clear error. We do have serious doubts whether, standing alone, Pierce's allegations that Mr. Jewel had threatened him are sufficiently reliable to form the basis for the obstruction enhancement. Nor do we find significant the fact that one of those threats was "corroborated" by his attorney, for the attorney apparently knew of the threat only through Pierce's report to him. Nonetheless, the October 1 shooting incident, which Mr. Jewel does not deny took place, itself tends to corroborate Pierce's claims, and an account of that shooting was before the district court. Pierce was cooperating with authorities when they set up the proposed cocaine transaction that led to Pickens' arrest on September 21. Part of that cooperation involved meeting with Mr. Jackson and Mr. Jewel in Atlanta. By the time the alleged threats were received, Mr. Jewel certainly might have learned—or at least strongly suspected—that Pierce had been working with authorities when he traveled to Atlanta. Moreover, knowing that his coconspirator had been arrested in Milwaukee, Mr. Jewel would have been unlikely to use a telephone to which his threatening call to Pierce could be traced. That Pierce was accused of being a "snitch" and attacked just a few days after Mr. Jewel was arrested tends to corroborate Pierce's claim that Mr. Jewel had called him and implied that Pierce would end up the same way as the murdered Porter Magee. Thus, we conclude that the district court did not err in enhancing Mr. Jewel's offense level for obstruction of justice.

### Conclusion

For the foregoing reasons, the convictions of Mr. Jewel and Mr. Jackson are affirmed, but their sentences are vacated and their cases remanded to the district court for resentencing.

AFFIRMED IN PART AND VACATED AND REMANDED IN PART.

EASTERBROOK, Circuit Judge, concurring.

The prosecutor urges us to hold that the exclusionary rule may not be used in sentencing, relying on 18 U.S.C. § 3661, which provides: "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Unless this statute is unconstitutional, or negates only the ordinary rules of evidence, the exclusionary rule is inapplicable. Is § 3661 consistent with the fourth amendment? Two recent cases hold that it is. *United States v. McCrory*, 930 F.2d 63 (D.C.Cir.1991); *United States v. Torres*, 926 F.2d 321 (3d Cir.1991). On remand the district judge must decide whether to follow these decisions, if Jackson establishes that the search invaded his interests. I offer some thoughts for his consideration.

*McCrory* and *Torres*, like a few preguidelines cases, mention the possibility—which they neither embrace nor reject—that these courts might exclude evidence that the police illegally seized expressly for use in sentencing. Judge Silberman's opinion concurring in *McCrory* observes that such an exception is chimerical. 930 F.2d at 72. Police do not mull over the potential uses of evidence, fix on *a* use, and then seize the evidence for that purpose. Officers have multiple purposes—they want to close down drug operations (even if no prosecution ensues), they want to get the goods that will help turn a dope peddler against his supplier, they want to facilitate convictions, they want to maximize sentences when convictions occur. It is inconceivable that any defendant will be able to show that the police had only one of these purposes in mind when making a seizure. *None* has been able to make such a showing in the 23 years since *Verdugo v. United States*, 402 F.2d 599, 611 (9th Cir.1968), raised the possibility.

It is awfully hard to see why motive should matter on either prudential or doctrinal grounds. Is the seizure less offensive to the Constitution, or is deterrence less important, when the police drain their minds of the possibility that the seizure will contribute to a conviction? As for

doctrine: the fourth amendment establishes an objective standard. *Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989); *Maryland v. Macon,* 472 U.S. 463, 470–71, 105 S.Ct. 2778, 2782–83, 86 L.Ed.2d 370 (1985); *Scott v. United States,* 436 U.S. 128, 136–38, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978). I think it most unlikely that the Supreme Court will admit intent through the back door in deciding whether to apply the exclusionary rule. Application is categorical: the exclusionary rule applies, or it doesn't, to one or another juncture of litigation. Evidence is excluded from the prosecution's case-in-chief, for example, but may be used as impeachment of the defendant or to support deportation. *United States v. Havens,* 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980); *INS v. Lopez–Mendoza,* 468 U.S. 1032, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984). Not one of the Supreme Court's opinions implies that the rule may apply when the police have one motive and dissolve when the police have a different one. Even *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), the principal non-categorical exception to the rule, employs only objective criteria. Evidence seized on the authority of a warrant is admissible unless the warrant was so weak that reliance was "objectively" unreasonable, *id.* at 922, 104 S.Ct. at 3420, or unless the officers procuring the warrant misrepresented or withheld material facts, *id.* at 923, 104 S.Ct. at 3421. Neither of these exceptions makes anything of intent. "The exclusionary rule is a prophylactic: it applies across the board in situations where the incentives for the police and the deterrence provided by the rule are such that exclusion is required and without reference to what motivated the particular search in issue." *McCrory,* 930 F.2d at 72 (Silberman, J., concurring).

Why invite a subjective inquiry that is inconsistent with the Supreme Court's approach to the fourth amendment and at all events a false hope to defendants? In the end we will have a simple answer: the exclusionary rule applies to sentencing, or it does not. Today the scope of the exclusionary rule depends on instrumental considerations, as *Leon* shows vividly. See also, e.g., *Illinois v. Krull,* 480 U.S. 340, 347, 107 S.Ct. 1160, 1165–66, 94 L.Ed.2d 364 (1987). Exclusion deters wrongdoing but also deprives the court of valuable evidence. How much of one goal to sacrifice in pursuit of the other is a difficult question. Congress answered it in favor of using the evidence, but that cannot be dispositive, else Congress could abolish the exclusionary rule without putting anything in its place. If criminal prosecutions (or even disciplines) of officers who violated the fourth amendment were routine, or if victims of illegal searches received monetary balm, abrogation of the exclusionary rule would be attractive. See Richard A. Posner, *Rethinking the Fourth Amendment,* 1981 Sup.Ct.Rev. 49. But police carry out unreasonable searches and seizures without fearing so much as the loss of a day's pay, and official immunity makes it next to impossible to recover damages. Immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986). So the victim anticipates no compensation, the offender no deterrence. Serious inroads on the exclusionary rule mean, as a practical matter, serious inroads on the fourth amendment.

Before November 1987 using illegally seized evidence in sentencing could not have been called a serious inroad on the exclusionary rule. Judges based their sentences on the crimes the prosecutor had proved plus the character of the defendant. To get a steep sentence the prosecutor needed to obtain a conviction on one very serious charge or multiple less serious ones. Excluding the evidence from the case in chief was a grievous, often mortal, blow. Today prosecutors often present at trial only a small fraction of the defendant's provable conduct. The rest is reserved for sentencing. Instead of a wide-ranging inquiry into the defendant's character in which "the punishment should fit the offender and not merely the crime", *Williams v. New York,* 337 U.S. 241, 246–47, 69 S.Ct. 1079, 1082–83, 93 L.Ed. 1337

(1949), sentencing has become a focused inquiry into the defendant's crimes. In drug cases the guidelines require the court to take into consideration all quantities sold or under negotiation as "part of the same course of conduct or common scheme or plan as the offense of conviction". U.S.S.G. § 1B1.3(a)(2). Our case is the norm: the prosecutor charged the defendants with distributing slightly more than 5 kilograms of drugs but asked for a sentence based on more than 50 (and the court imposed a sentence based on more than 15). Where once courts sentenced the offender and not the conduct, now courts sentence for crimes that were the subject of neither charge nor conviction. In proving such additional crimes, illegally seized evidence may play a central role—the same sort of role it used to play in supporting convictions on additional counts.

Changing the importance of conviction versus sentencing would not be troubling if statutes capped the effects of using illegally-seized evidence in sentencing. But the last five years have witnessed astounding increases in the maximum sentences for drug offenses. Until a few years ago the maximum penalty for distributing cocaine, no matter how much, was 15 years in prison, and the prisoner was eligible for parole after serving a third of that time. 21 U.S.C. § 841(b)(1)(A) (1982 ed.). Higher sentences could be meted out to kingpins, repeat offenders, or those who sold to minors or close to a school, but the maximum for simple distribution set the practical limit in most cases. How times have changed! The crime of which Jewel and Jackson were convicted, selling more than 5 kilograms of a mixture containing a detectable amount of cocaine, 21 U.S.C. § 841(b)(1)(A)(ii)(I), carries a minimum of 10 years and a maximum of life. Parole has been abolished. If the police seize 5 kilograms legally and another 46 illegally, this statute, coupled with § 1B1.3(a)(2), allows the court to impose a sentence of life imprisonment, just as if all of the drugs had been seized in compliance with the Constitution. Someone caught with *any* cocaine, no matter how little, faces 20 years without parole, 21 U.S.C.

§ 841(b)(1)(C). One with no prior convictions cannot receive 20 years under the guidelines until offense level 37, equivalent to 150 kilograms of cocaine (or 1.5 kilograms of crack). So if the police seize a smidgen of cocaine legally, the suspect can be locked up for 20 years if the police seize another 1500 grams of rock cocaine, or 150 kilograms of powered cocaine, in violation of the fourth amendment. By any account that would be a serious inroad on the exclusionary rule.

Judge Silberman recognized that to allow the use of unconstitutionally seized evidence in sentencing is to take "a big bite out of the exclusionary rule", *McCrory*, 930 F.2d at 72, but was willing to masticate that possibility because, he thought, the Supreme Court is on the verge of scuttling the rule—perhaps even of overruling *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). I do not read the Court's cases so. A jurisdiction wanting to use unconstitutionally seized evidence has to create some substitute—whether careful training and discipline of the police, see Anthony G. Amsterdam, *Perspectives on the Fourth Amendment*, 58 Minn.L.Rev. 349, 428–29 (1974), or an expansion of civil liability. A combination of official immunity with official indifference to employees who violate the Constitution means that the exclusionary rule still has a vital role to play. I appreciate the arguments in *Torres* and *McCrory* but cannot resist the conclusion that if we do not apply the exclusionary rule in sentencing under the guidelines, the constitutional ban on unreasonable searches and seizures will become a parchment barrier.