UNITED STATES of America, Appellee,

v.

Jackie Dale LOWRIMORE,
Sr., Appellant.

No. 90–1952WA.

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 26, 1990.

Decided Jan. 11, 1991.

Gene Stipe, McAlester, Okl., for appellant.

William Cromwell, Fort Smith, Ark., for appellee.

Before ARNOLD, Circuit Judge,
FLOYD R. GIBSON and HEANEY,
Senior Circuit Judges.

ARNOLD, Circuit Judge.

Jackie Dale Lowrimore, Sr., appeals from a jury conviction for his part in a murder-for-hire scheme targeting his ex-wife. Shirley Lowrimore was murdered in Le-Flore County, Oklahoma, on September 29, 1989.[1] This case was brought in federal district court in Arkansas[2] as a result of events preceding the murder, including a non-fatal shooting of Shirley Lowrimore on July 22, 1989, in Fort Smith, Arkansas. The two-count indictment alleged that Lowrimore used interstate-commerce facilities in a conspiracy for the commission of mur-

---

1. After the trial of this case, Lowrimore was convicted in an Oklahoma state court of murdering his former wife, and sentenced to life in prison without parole.

2. The Hon. H. Franklin Waters, Chief Judge, United States District Court for the Western District of Arkansas.

der for hire (count one), and that he aided and abetted in the use of interstate-commerce facilities in the commission of murder for hire (count two), in violation of 18 U.S.C. §§ 2, 371, and 1958(a). The jury returned guilty verdicts on both counts. Lowrimore was sentenced to 262 months of imprisonment, three years of supervised release, and to pay a fine of $20,000 and a special assessment of $100. We affirm.

The government's version of the events surrounding the July 22, 1989, shooting, which the jury was entitled to believe, is as follows. In April 1989, Lowrimore offered Jimmy Thomas $1200, and the forgiveness of a debt Thomas owed Lowrimore of approximately $1100, to kill his ex-wife. At that time, Shirley Lowrimore was living in Arkansas. Lowrimore and Thomas lived in Oklahoma. Thomas gave the $1200 to Ronnie Woodson for Shirley Lowrimore's murder, but Woodson failed to follow through on his obligation, and never returned the money to Thomas.

Thomas then hired Phillip Allen Potter, who also lived in Oklahoma, to kill Shirley Lowrimore. Potter agreed to the killing for $350—$200 to purchase a used car for himself, and $150 for expenses in connection with an upcoming move. Thomas supplied Potter with three guns obtained from Lowrimore and lent Potter a vehicle to drive from Oklahoma to Arkansas. Potter and several friends[3] made numerous trips in May and June seeking an opportunity to kill Lowrimore's ex-wife. On July 22, outside her apartment in Fort Smith, Shirley Lowrimore was shot several times with a .20 gauge shotgun. She survived this attack but required hospital treatment. Immediately after the shooting, Potter reported to Thomas (mistakenly, as it turned out) that his group had killed Shirley Lowrimore.

Potter and Thomas testified at Lowrimore's trial. Thomas told the jury that Lowrimore provided him with weapons and keys to Shirley Lowrimore's apartment and car, in addition to the $1200 in cash. Tr. I–70–71. Thomas also stated that after the July 22 shooting, Lowrimore asked for the .20 gauge shotgun to be returned, so "he could get rid of it permanently." Tr. I–79. Lowrimore told Thomas that "the job was botched"—"[i]t wasn't completed." Tr. I–80. Lowrimore "kept insisting that he wanted her killed." Tr. I–81. Potter testified that he had no direct conversations with Lowrimore, but he knew from Thomas that the killing was to be done at Lowrimore's direction. Tr. I–162–63.

On appeal, Lowrimore raises numerous issues relating to his trial and sentence.[4] The primary claim of trial error comes from Lowrimore's efforts to keep from the jury the fact that he had been charged in another court with his ex-wife's murder. The District Court ruled that the government could not mention the Oklahoma indictment during the trial. The defense requested that certain other evidence be excluded, including an autopsy report showing Shirley Lowrimore's cause of death, but the Court allowed both the autopsy report and "any actions [Lowrimore] took up to the murder," so long as the evidence was probative of Lowrimore's intent to commit the crimes of conspiring, aiding, and abetting in the commission of a murder for hire. Tr. I–8. Lowrimore claims the government violated these pretrial evidentiary rulings on two occasions, and because of the resulting degree of prejudice, he says he should have been granted a mistrial.

The first alleged violation concerns the Court's order not to bring up the Oklahoma proceedings. On direct examination of Jimmy Thomas, the government attorney asked: "Did you have any other conversations with Mr. Lowrimore after her death?" Thomas replied: "Yes, sir. It was a little while after he was bonded out

---

3. Potter testified that he was accompanied on some of the trips by Jeremy Parker, Lee Martin, Keith Butler, and Harlan Daniel Sweeten. Lee Martin and Jeremy Parker accompanied Potter on the night that Shirley Lowrimore was shot. Tr. I–154, 156.

4. We need not address Lowrimore's contention that he was improperly denied release pending sentencing and appeal. Because we affirm Lowrimore's conviction and sentence, these issues are now moot.

after being charged." Tr. I–82. From this point on, Lowrimore maintains, the jury knew about the Oklahoma murder charge, making it impossible for Lowrimore to receive a fair trial.

We do not agree that a mistrial was warranted. Although Thomas was apparently referring to the Oklahoma murder charge, it is not at all clear that the jury so concluded. The jury could have thought Thomas was referring to charges in this prosecution, or a prosecution in another court unrelated to Shirley Lowrimore's death. Even if the jury understood that Lowrimore had been charged with his ex-wife's murder (and assuming such knowledge was unduly prejudicial), his counsel did not request an instruction to the jury that any other charges or criminal proceedings were irrelevant to the case at hand. Rather, his counsel requested a mistrial—a remedy reserved for significant, highly prejudicial trial errors. While an instruction to the jury might have been appropriate here, had one been requested, the vagueness of Thomas's answer, and the inadvertent character of the government's conduct, are not sufficiently serious for us to conclude that the District Court abused its discretion in failing to declare a mistrial.

■ The second alleged violation occurred during the government's cross-examination of Lowrimore. Lowrimore was asked: "What did you do to disguise your identity on the day of the murder?" Tr. II–222. The District Court overruled defense objections to the question, stating that it did not implicate the Oklahoma murder charge, and was relevant to intent under Rule 404(b) of the Federal Rules of Evidence. Lowrimore then explained that he had been seen wearing a wig "within a couple of hundred yards" of where his wife's body had been found, and that he had worn the wig to conceal his identity. Tr. II–223.

No error occurred here. The jury already knew, and was entitled to know, that Shirley Lowrimore had been murdered. Any evidence linking Lowrimore to her murder is relevant to the crime he was tried for in the District Court—hiring someone to have Shirley Lowrimore killed. Wearing a disguise in close proximity to where his ex-wife's body was found, and on the same day, tends to prove that Lowrimore murdered his wife. It also tends to prove that Lowrimore wanted his wife dead badly enough to do it himself, which, in turn, makes it more likely he would have hired someone else to do the job. Fed.R. Evid. 404(b) allows evidence of other crimes to prove motive and intent. Of course such evidence is prejudicial, as all relevant evidence invariably is, so the only question is whether this evidence was unfairly prejudicial, in effect denying Lowrimore a fair trial. We cannot say that it was, particularly since this question was properly within the scope of cross-examination of Lowrimore, who had denied any knowledge of or participation in a scheme to have his ex-wife killed.

■ Lowrimore also claims he should have been granted a mistrial following an improper statement by the prosecuting attorney during his cross-examination. Counsel for the government concluded his questioning of Lowrimore with: "You know, Mr. Lowrimore, I've seen you testify, this is the third time now, and the main thing that struck me—I've never seen any remorse that your wife is dead, Mr. Lowrimore." Tr. II–224. We agree that government counsel's statement was improper, not only because he misstated the number of times Lowrimore had previously testified, but also because statements by counsel are not evidence, and should not be offered as such. (At the oral argument, government counsel forthrightly conceded that he should not have made the statement.) The District Court might have instructed the jury to this effect, and that would have been appropriate. However, defense counsel did not request a limiting instruction, and we conclude that the improper statement was harmless beyond a reasonable doubt in light of all the other evidence against Lowrimore. In any event, the District Court did not abuse its discretion in denying Lowrimore's request for a mistrial.

Lowrimore raises two other trial errors. He contends the District Court improperly limited cross-examination of Thomas's financial status, and that the government failed to prove any connection between Lowrimore and the $350 paid by Thomas to Potter. We have considered both of these claims and have determined them to be without merit.

■ We do find merit in Lowrimore's challenge to the procedures used at his sentencing, but the error does not require reversal of his sentence. After Lowrimore was convicted, a probation officer prepared a Presentence Report detailing conduct which the officer considered to be relevant to Lowrimore's sentence under the United States Sentencing Guidelines. The officer testified that he prepared much of the Report from the files of the United States Attorney in charge of the prosecution. As a result, the officer reported statements of witnesses whom he had not personally interviewed. Some of the witnesses whose statements were included in the Report had not testified at trial, and the officer admitted that he did not know if their statements had been made under oath. Lowrimore objected to many of the factual statements made in the Report. The only witness presented at sentencing was the probation officer, who testified to the manner of his preparation of the Report. The District Court then placed the burden on Lowrimore to refute the factual statements contained in the Report.

■ This procedure violated Lowrimore's rights under the Confrontation Clause, contained in the Sixth Amendment to the Constitution of the United States. In *United States v. Fortier*, 911 F.2d 100 (8th Cir.1990), a case decided after Lowrimore's trial was completed, we outlined the appropriate procedure to be used at sentencing to avoid Confrontation Clause problems when hearsay testimony is presented. We said:

The Confrontation Clause requires that the government make its proof in a reliable fashion; the absence of proper confrontation of witnesses calls into question the integrity of the fact-finding pro-

cess. A court may rely solely upon a presentence report for findings relevant to sentencing only if the facts in the presentence report are not disputed by the defendant.

911 F.2d at 103. Hearsay statements used against a defendant at sentencing, over the defendant's objection, violate the Confrontation Clause unless the statements are within well-recognized exceptions to the hearsay rule, or unless the court makes a finding that the statements are otherwise especially reliable. *Cf. Idaho v. Wright*, —— U.S. ——, 110 S.Ct. 3139, 3145–52, 111 L.Ed.2d 638 (1990).

Because Lowrimore objected to the hearsay statements contained in the Report, the Court should have decided whether each statement objected to fit within a well-recognized exception to the hearsay rule, or bore some "particularized guarantees of trustworthiness." *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980). Calling the probation officer to testify about how he prepared the report did not correct the problem. As we said in *Fortier*, "[t]he Confrontation Clause requires that district courts not rely on the Presentence Report alone for the required trustworthiness evaluation—such fact-finding is a judicial function, not to be delegated to staff people." 911 F.2d at 104. The probation officer here had no personal knowledge of the events; Lowrimore's objections to the sentencing procedure are thus well taken.

The procedural error at sentencing was undoubtedly harmless in this case, however, and we affirm Lowrimore's sentence. The District Court was entitled to rely upon its recollection of testimony at Lowrimore's trial. The hearsay statements in the Report made by Jeremy Parker, Ronnie Woodson, and Harlan Daniel Sweeten, none of whom testified at trial, were inconsequential to the determination of Lowrimore's sentence. The District Court had already heard adequate testimony at trial for each enhancement Lowrimore received: two levels for more than minimal planning, U.S.S.G. § 2A2.1(b)(1); four levels for serious bodily injury to the victim,

§ 2A2.1(b)(3)(B); five levels for discharge of a firearm during the offense, § 2A2.1(b)(2)(A); two levels because the conspiracy was motivated by a payment or offer of money (trial testimony indicated Lowrimore was motivated at least in part by an insurance policy on Shirley Lowrimore's life), § 2A2.1(b)(4); and four levels for being an organizer or leader of a criminal activity involving five or more participants, or which was otherwise extensive, § 3B1.1(a).

The judgment of the District Court is affirmed.