Robert D. COOK, Plaintiff,

Leonard C. Jaques, Attorney-Appellant,

v.

AMERICAN STEAMSHIP COMPANY,
Defendant–Appellee.

No. 96–2051.

United States Court of Appeals,
Sixth Circuit.

Argued Sept. 9, 1997.

Decided Jan. 20, 1998.

Michael J. Connor (argued and briefed), Robert J. Allen (briefed), Jaques Admiralty Law Firm, Detroit, MI, for Attorney–Appellant.

Thomas W. Emery (argued and briefed), David M. Shafer (briefed), Garan, Lucow, Miller, Seward & Becker, Detroit, MI, for Defendant–Appellee.

Before: MERRITT, NORRIS, and CLAY, Circuit Judges.

## OPINION

CLAY, Circuit Judge.

Leonard C. Jaques appeals from the district court's June 13, 1996 and July 15, 1996 orders imposing sanctions upon him pursuant to 28 U.S.C. § 1927. For the reasons set forth below, we **AFFIRM** the district court's orders regarding imposition of sanctions.

### I.

This appeal arises out of an incident that occurred on May 7, 1996, at the end of the first day of retrial in the underlying suit, in the courtroom of the lower court.[1] In his June 13, 1996, opinion and order [hereinafter *June 13th Order*], Judge Bernard Friedman, the United States District Court Judge assigned to the case, noted that, on that day, at approximately 5:00 p.m., the court had adjourned, and the judge had just left the bench. In the courtroom remained plaintiff's expert witness, Dr. Kresta, the court reporter, Fred Pratt, the parties and their counsel. Mr. Jaques was counsel to the plaintiff in the underlying suit, and Mr. Emery was counsel to the defendant. Thereafter, Fred Pratt entered Judge Friedman's chambers, exclaiming "Judge, Mr. Jaques just hit Mr. Emery!" Judge Friedman returned to the courtroom and inquired into what had just happened. Mr. Emery responded that he was just assaulted by Mr. Jaques. Federal Protective Service ("FPS") officers were

---

1. Following the first trial of the underlying suit, this Court vacated the judgment of the district court, and remanded the case for a new trial. (J.A. at 41.)

called, and they took statements from witnesses.[2] (J.A. at 140–141.)

In their statements to FPS, Mr. Emery and Mr. Jaques claimed the following:

> **Mr. Emery**—I was holding a large (2' × 1') box in both hands that contained evidence (a large rope). I had told Mr. Jaques and his expert—Kresta—that they could not examine the rope, had put it away and had turned to put it against the wall when Mr. Jaques grabbed the hair on the top of my head and threw me to the floor, ripping hair from the top of my head.
>
> **Mr. Jaques**—Dr. Kresta, my expert, began to assess the severed end of the rope when Mr. Emery in a bellecose [sic] voice shouted to my expert, "don't handle my rope, god damn you, you are not going to [illegible] my rope at all!" Emery was ballistic and he was shouting to Dr. Kresta and I was afraid Emery was going to hit Dr. Kresta who is recovering from heart surgery, so I reached atop Emery's head and pulled his head back with the flat of my left hand, to separate him from my expert, whereupon Emery hit the floor,

feining [sic] an attack and deliberately acted as if he had been assaulted and knocked down.

When court convened the next morning, defendant moved for a 24–hour adjournment and for disqualification of plaintiff's counsel from the trial. The lower court denied defendant's motion to disqualify Mr. Jaques. Defense counsel then moved for a mistrial, claiming that he was emotionally distraught from what occurred the preceding day, and thus, was unable to continue with the trial. The lower court granted the motion and declared a mistrial, noting that whoever was found responsible for the mistrial would be assessed costs. The lower court also indicated that factual findings would not be made at that point, but the FPS and the U.S. Marshals' report would play a role in that determination. *See infra* Part II.C. On May 9, 1996, an order was issued declaring a mistrial.

Based on the eventual receipt of the FPS report ("Incident Report"), (J.A. at 123), which included statements from witnesses,

---

2. Witnesses' statements taken by the FPS moments after the incident are, in relevant part, as follows:

> **J.E. Kresta**—I got permission of judge [sic] to take a look at broken rope which is used as an evidence [sic]. When a judge [sic] left the courtroom, Mr. Emery arrogantly took rope from my hands and prevented me from inspection [sic] of the rope. His action created situation [sic] which resulted with a squable [sic] between Mr. Emery and Mr. Jacques [sic].
>
> **Donald Krispin**—The court specifically allowed the inspection to take place immediately with attorneys present. Mr. Emery immediately shouted and threatened Mr. Jaques and Dr. Kresta pulling the exhibit from plaintiffs [sic] expert and pulling the box away from Mr. Jaques. Mr. Jaques reached for the box and Mr. Emery continued to shout at Dr. Kresta that he could not and would not handle the rope exhibit. At this point Mr. Emery fell to the ground in an exaggerated fashion and claimed he had been assaulted.
>
> **Fred Pratt**—Witness was examining rope exhibit. Mr. Emery accused witness of being too rough with exhibit, and was in process of removing it. Argument ensued between witness, Mr. Jacques [sic] and Mr. Emery.
>
> Mr. Jacques [sic] said something to the effect, "You S.O.B., I ought to hit you." With that said, Mr. Jacques [sic] reached up and appeared to have grabbed Mr. Emery by the hair, pulling him head first into floor.

> I then went and got Judge Friedman, who came in courtroom and informed the parties he would call Fed. Police so reports could be made.
>
> **Thomas Lenney**—Mr. Emery asked the gentleman not to mishandle the rope or touch it without Mr. Emery watching. In disregard of this request, the gentleman continued to manipulate the rope. Mr. Emery proceeded to attempt to take the rope away stating: "You don't handle my property that way." At this time, Mr. Emery bent over to pick up the rope. It was at this point that Mr. Jacques [sic] reached over grabbing Mr. Emery by the head & hair and ultimately throwing him to the ground yelling: "You bring that back here."
>
> **Richard Keaton**—Mr. Emery took the rope out of the box for examination by Mr. Jaques and his witness. He asked them to be careful. Mr. Jaques [sic] witness started recklessly handling the evidence. Tom Emery objected to this and said the exam was over. Leonard Jaques then started yelling at Tom Emery that he couldn't do that. Tom Emery continued packing the rope away. Leonard Jaques started calling him names and then all of the sudden grabbed Tom Emery by the hair on top of his head. He pulled Tom Emery over at the waist, then threw him to the ground. I was about 2 feet away from Tom the whole time.

the court made an initial determination, on May 15, 1996, that Mr. Jaques was responsible for the assault that caused the mistrial. Moreover, the court ordered Mr. Jaques to show cause, no later than May 28, 1996, as to why he should not be assessed costs, expenses and attorney fees pursuant to 28 U.S.C. § 1927[3] and the court's inherent power.

Mr. Jaques filed a motion for an extension of time to respond to the order which was denied by the lower court on May 24, 1996. Mr. Jaques filed a timely response to the show cause order on May 28, 1996.

Mr. Jaques then filed a motion for recusal. In its June 13th Order, the lower court denied that motion and imposed sanctions pursuant to 28 U.S.C. § 1927, for the court's excess costs and expenses—ultimately finding that Mr. Jaques was at fault. The lower court, in making a factual determination as to whom was at fault for causing the incident in the courtroom which led to the May 9th mistrial, considered the Incident Report, witnesses' statements, and Mr. Jaques' response to the court's show cause order.

On July 15, 1996, additional sanctions were imposed upon Mr. Jaques, pursuant again to 28 U.S.C. § 1927, for the defendant's costs, expenses, and attorney fees. Mr. Jaques filed a timely notice of appeal on August 7, 1996.

## II.

### A. Sanctions pursuant to 28 U.S.C. § 1927

■ We review the lower court's imposition of sanctions, pursuant to 28 U.S.C. § 1927, for abuse of discretion. *Holmes v. City of Massillon*, 78 F.3d 1041, 1049 (6th Cir.1996). A court may impose sanctions, pursuant to § 1927, personally upon an attorney who " 'multiplies the proceedings in any case unreasonably and vexatiously' where the attorney's conduct amounts to 'a serious and studied disregard for the orderly processes

of justice.' " *Barney v. Holzer Clinic, Ltd.*, 110 F.3d 1207, 1212 (6th Cir.1997). Moreover, § 1927 sanctions are "warranted when an attorney has engaged in some sort of conduct that, from an objective standpoint, 'falls short of the obligations owed by a member of the bar to the court and which, as a result, causes additional expense to the opposing party.' " *Holmes*, 78 F.3d at 1049 ( quoting *Ruben v. Warren City Sch.*, 825 F.2d 977, 984 (6th Cir.1987)).

### B. Federal Rules of Evidence

■ Mr. Jaques first argues that the Federal Rules of Evidence ("FRE") are applicable to the imposition of sanctions pursuant to § 1927. Specifically, Mr. Jaques asserts that the FRE require a full evidentiary hearing with sworn testimony and cross-examination. He contends that due process mandates that the aforementioned procedures apply to the imposition of sanctions when, as here, the incident giving rise to the sanctions happened outside the presence of the court. We disagree.

It is apparent in this circuit, as well as others, that when imposing sanctions, a full evidentiary hearing is not required. *Big Rapids Mall Associates v. Mut. Trust Life Ins. Co.*, 98 F.3d 926, 929 (6th Cir.1996) (holding that "[a] hearing is not necessarily required where the court has full knowledge of the facts and is familiar with the conduct of the attorneys"). *See also Travelers Ins. Co. v. St. Jude Hosp. of Kenner, La., Inc.*, 38 F.3d 1414, 1418 (5th Cir.1994) (concluding that "[t]he right to a hearing . . . is limited to cases where a hearing would assist the court in its decision"); *Jones v. Pittsburgh Nat'l Corp.*, 899 F.2d 1350, 1359 (3rd Cir.1990) (finding that it is within the district court's discretion to determine whether an evidentiary hearing is required); *Kapco Mfg. Co., Inc., v. C & O Enter., Inc.*, 886 F.2d 1485, 1495 (7th Cir.1989); *Ahmed v. Reiss Steamship Co. (In re Jaques)*, 761 F.2d 302, 306 (6th Cir.1985) (holding that sanctions can be

---

**3.** 28 U.S.C. § 1927 provides that:

Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vex-

atiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

assessed pursuant to § 1927 without holding a hearing)[4]. What is required, however, is that before the imposition of sanctions, the attorney must be given notice and an opportunity to be heard. *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 767, 100 S.Ct. 2455, 2464, 65 L.Ed.2d 488 (1980). An order to show cause, along with an opportunity to respond to said order, can be sufficient, in certain circumstances, to provide the necessary procedural safeguards:

> If [a] court intends to sanction an attorney ... due process is satisfied by issuance of an order to show cause why sanctions should not be imposed and by providing an opportunity to respond. Due process, however, is a flexible concept and the particular procedural safeguards required will vary depending upon all the circumstances.

*Julien v. Zeringue*, 864 F.2d 1572, 1575 (Fed. Cir.1989) (citations omitted). *See Braley v. Campbell*, 832 F.2d 1504, 1515 (10th Cir. 1987).

Based on the aforementioned, Mr. Jaques' assertion, that his due process rights were violated because the lower court did not apply the FRE when it imposed sanctions pursuant to § 1927, is without merit. Procedurally in the case at hand, all due process requirements have been satisfied. Before imposing sanctions, the lower court ordered Mr. Jaques to show cause why sanctions should not be assessed against him pursuant to § 1927, and provided him ample time to respond to its order. Thus, Mr. Jaques was given " 'specific' notice of the sanctioning authority being considered and the conduct alleged to be sanctionable[,]" as well as an opportunity to be heard. *Ted Lapidus, S.A.*

*v. Vann*, 112 F.3d 91, 96 (2nd Cir.1997). Mr. Jaques has, therefore, received all the procedural process that was due.

██ Moreover, although the incident happened outside the presence of the court, that fact alone does not require an evidentiary hearing. It is within the discretion of the district court to determine whether an evidentiary hearing would assist the court in its decision. We hold that under the circumstances of this case, the district court did not abuse its discretion in deciding not to conduct an evidentiary hearing.

In determining that Mr. Jaques was responsible for the assault that caused the mistrial, the lower court considered the Incident Report, witnesses' statements, and Mr. Jaques' response to the court's show cause order, an eleven-page detailed response outlining why he should not be sanctioned for his actions. The court, in its June 13th Order, noted that it carefully considered Mr. Jaques' response to the show cause order. (J.A. at 150.) Therefore, a hearing would have only provided Mr. Jaques with another opportunity to rehash what he already contended in his response to the show cause order. The lower court had all it needed to make a determination of fault; it had all of the witnesses' statements as well as Mr. Jaques' rendition of the incident. Moreover, Judge Friedman was very familiar with the conduct of the attorneys, having presided over the underlying proceeding since 1993; who could better assess the conduct of the attorneys than someone who was not only familiar with the attorneys but with the witnesses as well.[5] We find nothing in the

4. Note that the appellant in *Reiss* is in fact the appellant in the case at hand. In *Reiss*, Mr. Jaques was sanctioned for civil contempt. *Id.* at 305. Mr. Jaques raised the claim, as he does in the present case, that he was denied his procedural due process. Specifically, Mr. Jaques contended that the district court's show cause order did not specify whether the contempt proceedings were either civil or criminal; claiming that the proceedings were in fact criminal and, therefore, he was entitled to procedural due process. *Id.* This Court concluded that the contempt proceedings were in fact civil; thus, Mr. Jaques was "not entitled to the procedural protections afforded criminal defendants." *Id.* at 306. However, this Court noted that Mr. Jaques was indeed provided with procedural safeguards; the

show cause order acted as notice and was sent well in advance of the contempt hearing, providing Jaques a reasonable time in which to prepare a defense. *Id.*

In addition, this Court held that although the lower court did not rely on 28 U.S.C. § 1927, Mr. Jaques' conduct could have been sanctioned under that statute; this court noted that procedurally, in § 1927 actions, a hearing is not required. *Id.* Ultimately, this Court affirmed the lower court's decision to impose sanctions based on the authority of § 1927. *Id.*

5. Witness Fred Pratt was Judge Friedman's court reporter. *See supra* Part I. and note 2.

record to indicate that a hearing was needed to assist the court in its decision that Mr. Jaques acted without justification in laying his hands on Mr. Emery. Therefore, it was proper for the lower court to assess sanctions upon Mr. Jaques pursuant to § 1927 without holding an evidentiary hearing.

### C. The Court's Fact-finding Function

■ Mr. Jaques next argues that the district court delegated its adjudicative duties to the U.S. Marshals and the FPS. Mr. Jaques specifically is referring to the statements of the lower court, made on May 8, 1996, the morning after the incident occurred. During the proceedings on May 8th, the following transpired:

> **Mr. Jaques:** If it please the Court, I do say that I agree with the Court; no question, an episode occurred. Let me tell you what it was.
>
> **The Court:** I don't want to hear what it was, frankly. I think I'll leave that up to the Federal Protective Service and the U.S. Marshal to determine the facts of what happened and then send it over to the U.S. Attorney's office. If a crime occurred in this courtroom, I intend to leave that up to the executive branch of government. That's up to them to determine what happened and what didn't happen, but I do know something happened that shouldn't have happened.

(J.A. at 103–104.)

■ Mr. Jaques properly indicates that it is indeed improper for a district court to delegate its fact-finding function to other entities. *See Banks v. United States,* 614 F.2d 95, 97 (6th Cir.1980) (holding that fact-finding is within the exclusive function of a district judge); *United States v. Lowrimore,* 923 F.2d 590, 594 (8th Cir.1991) (concluding that "fact-finding is a judicial function, not to be delegated to staff people"); *United States v. Weichert,* 836 F.2d 769, 772 (2nd Cir.1988) (finding that "adjudication is solely a judicial function"). However, such a delegation of responsibility did not occur in the case at hand.

The lower court addressed this very issue in its June 13th Order, stating that it based its factual determination on an independent assessment of the Incident Report prepared by the FPS, witnesses' statements and Mr. Jaques' response to the court's show cause order. The lower court also noted that the Incident Report did not make any determination as to whom was at fault, but only laid out Mr. Emery's and Mr. Jaques' versions of the story; leaving it to the lower court to actually resolve the factual dispute.

Although some of the statements made by the lower court may have been unnecessary, there is no indication that the lower court delegated its adjudicative responsibility. It is clear that the FPS's Incident Report did nothing more than provide the lower court with additional statements by witnesses; it made no determination as to whom was responsible for the incident—that determination ultimately came from the lower court based on a reasoned analysis of the evidence. Therefore, we find that the lower court did not delegate its fact-finding function to the FPS.

### D. Burden of Proof

■ Mr. Jaques' next contention is that the court's show cause order improperly shifted the burden of proof to Mr. Jaques to prove his innocence. Based on the aforementioned, this claim must fail. *See* discussion *supra* Part II.B. and note 4. As stated above, a show cause order only acts as notice to the relevant party by informing the party what conduct is alleged to be sanctionable, and allows the party an opportunity to respond; by presenting evidence and arguments why sanctions should not be imposed, the party has the opportunity to "persuade" the court that sanctions are not warranted. This is a well established procedure in dealing with § 1927 sanctions and we see no reason to repudiate the procedure now. Therefore, the burden of proof has not been shifted; the show cause order merely facilitated the due process requirements; thus, this claim can be easily dismissed.

### E. The Applicability of a Criminal Defense

■ Mr. Jaques' final argument is that he should be excused for his actions because

he was going to the aid of another, his expert witness, Dr. Kresta. Specifically, Mr. Jaques asserts that he feared that Mr. Emery was going to assault Dr. Kresta. In support of his argument, Mr. Jaques cites to a Michigan pattern criminal jury instruction which provides that a person has the right to use force to defend another under certain circumstances. CJI 2d § 7.22. However, the individual must honestly believe that force is needed to protect the third party and must only use the degree of force necessary to protect the third party from danger. *Id.*

It is not surprising that Mr. Jaques has not cited any cases that support his contention that this criminal defense is applicable to the imposition of civil sanctions pursuant to § 1927. We hold that it is not. However, even if we assume that this defense is applicable to § 1927, Mr. Jaques has failed to satisfy the requirements.

Upon careful review of the witnesses' statements we do not believe that Mr. Jaques honestly believed that Dr. Kresta was about to be assaulted; thus, no force was needed. In his statement to the FPS, Dr. Kresta stated that "Mr. Emery *arrogantly* took the rope from [his] hands and prevented [him] from inspection of the rope." *See supra* note 2 (emphasis added). Donald Krispin, co-counsel to Mr. Jaques, stated to the FPS, that Mr. Emery "*shouted and threatened* Mr. Jaques and Dr. Kresta pulling the exhibit from plaintiffs expert and pulling the box away from Mr. Jaques." *Id.* Mr. Jaques claims that Mr. Emery "*shouted* to [his] expert, 'don't handle my rope, god damn you, you are not going to [illegible] my rope at all!'" *See supra* Part I (emphasis added).

There is no indication that Mr. Emery attempted to assault Dr. Kresta. Dr. Kresta himself never said he was in fear of assault, and therefore, in need of assistance.[6] All that is clear is that Mr. Emery took the rope from Dr. Kresta. Moreover, the fact that Mr. Emery "shouted" at Dr. Kresta and Mr. Jaques does not justify the use of physical force. Force can seldom be justified when used as a response to mere words, no matter how vile the words may be. Mr. Jaques has failed to satisfy the essential elements of this defense; in this Court's opinion, Mr. Jaques could not have honestly believed that force was necessary. Therefore, even if this defense applied to § 1927 actions, Mr. Jaques' contentions are without merit and must fail.

### III.

Mr. Jaques' conduct was deplorable and fell short of the behavior and demeanor expected of a member of the bar. His actions were unreasonable and caused additional expense to the opposing party. Therefore, the lower court did not abuse its discretion in determining that Mr. Jaques acted without justification in laying his hands on Mr. Emery; thus, sanctions pursuant to § 1927 were warranted.

For the foregoing reasons we **AFFIRM** the district court's June 13, 1996 and July 15, 1996 orders regarding imposition of sanctions.

---

6. Dr. Kresta's first statement was augmented by a second statement. In his second statement Dr. Kresta claimed that Mr. Emery threatened his person by using loud and insulting language and lunging at his person. (Appellant Br. at 9.) We believe that Dr. Kresta's first statement, taken moments after the incident occurred, is a better indication of Dr. Kresta's state of mind as well as his account of the incident.