# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

Nos. 02-3563, 02-3564 & 02-3842

UNITED STATES OF AMERICA,

*Plaintiff-Appellee, Cross-Appellant,*

*v.*

GREGORIO MACEDO,

*Defendant-Appellant,*
and

VICTOR HUGO CONTRERAS,

*Defendant-Appellant, Cross-Appellee.*

———————

Appeals from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 01 CR 57—**David H. Coar**, *Judge.*

———————

ARGUED OCTOBER 22, 2003—DECIDED APRIL 14, 2005

———————

Before FLAUM, *Chief Judge*, and EASTERBROOK and
WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Gregorio Macedo and Victor
Hugo Contreras were convicted of various drug offenses.
Defendant Macedo alleges several violations of *Apprendi v.
New Jersey*, 530 U.S. 466 (2000), which he contends render
his convictions and sentence infirm. He also argues that the

government lacked sufficient evidence to support his convictions. Defendant Contreras argues that evidence of prior bad acts was improperly admitted in violation of Rule 404(b) of the Federal Rules of Evidence. The government also appeals the district court's decision to grant defendant Contreras a one point downward departure based on his alien status. We affirm both convictions. However, because we find that the district court erred in its decision to downward depart, we must remand defendant Contreras for resentencing. In addition, in response to Macedo's petition for rehearing, we vacate his sentence as well and remand his case for resentencing consistent with the Supreme Court's recent decision in *United States v. Booker*, 125 S. Ct. 738 (2005).

## I. THE TRIAL

The following facts were presented at trial. On January 20, 2001, Francisco Maldonado Herrera (Maldonado) and Ricardo Mendez, Mexican nationals, traveled from Morelia, Mexico to O'Hare International Airport in Chicago, Illinois with over 400 grams of methamphetamine in the soles of their shoes. Months prior to their trip, Maldonado and Mendez were both approached in Mexico by a man known only as "Rene" and asked if they were willing to serve as drug carriers to the United States for $1500 per trip. Rene told the men that once in the United States, they would be met by a man named "Hugo" at the airport who would exchange the shoes containing the methamphetamine for new ones and purchase each a return ticket to Mexico.[1]

---

[1] While this was Mendez's first smuggling trip to the United States, it was Maldonado's third. On the two prior occasions, however, Maldonado traveled alone. His first trip occurred on November 3, 2000. Upon arrival at O'Hare, Maldonado was met by "Hugo,"

(continued...)

Maldonado was stopped by United States Customs Inspector Carlos Torres who noticed that he was wearing brand-new shoes which appeared too large for his feet. After receiving several evasive responses to his inquiries, Inspector Torres asked to see Maldonado's shoes, where he found the methamphetamine. Maldonado agreed to cooperate with the government by wearing a wire to record conversations between the defendants and Mendez. He also agreed to call Mexico in an effort to locate Contreras and Macedo in Chicago.[2] Maldonado was able to reach an associate of Rene's who gave him Contreras's cellular phone number as well as Macedo's home telephone number. Maldonado then phoned Contreras who agreed to meet him in the airport. All of these phone conversations were recorded by government officials.

While Mendez made it through customs, his contact, "Hugo," was not at the airport to meet him. During his wait, he made several phone calls to Mexico attempting to locate his contact. He was able to reach family members in Mexico who gave him two phone numbers as contacts. His family members received the information from Rene. The numbers were later identified as Gregorio Macedo's home telephone number and cellular phone number.

After several tries, Mendez was able to make contact with the defendants who met him at a diner near O'Hare

---

[1] (...continued)
whom he later identified in court as Victor Hugo Contreras. Contreras and Maldonado drove from the airport to Contreras's home where they exchanged the drug shoes for new ones. The men then returned to the airport and Contreras purchased Maldonado's return ticket to Mexico. This scheme occurred once more on November 17, 2000. Maldonado's testimony was corroborated by the Customs Record Log, which showed that he previously entered O'Hare Airport on November 3, 2000, and November 17, 2000.

[2] Both defendants were residing illegally in the United States.

Airport. The three men then drove to a shoe store where Macedo purchased a replacement pair of shoes for Mendez's return. After the trip to the shoe store, the three men checked into a motel near the airport. According to Mendez, the motel bill was also paid for by Macedo. The shoes containing the methamphetamine were left in the motel room and after receiving Maldonado's call, they returned to the airport. The four men met in Terminal 5 and began discussing Maldonado's experience with the customs agent. This conversation was recorded. Shortly thereafter, all four men were arrested by authorities.

Following the arrest, the government recovered the shoes from the motel room which contained 436.9 grams of methamphetamine (found to be 91% pure with an approximate street value of $175,000). The shoes seized from Maldonado at the airport contained 441.9 grams of methamphetamine (also 91% pure with a parallel street value). After a search of Contreras's car, the government also found the key to the motel room rented by Macedo in the glove compartment.

Mendez and Maldonado pleaded guilty and agreed to testify against Macedo and Contreras at trial. In addition to the testimony previously discussed, the evidence admitted during trial included: the testimony of the two coconspirators, various customs agents, a Drug Enforcement Agent, and several police officers; the shoes seized at the airport and the motel room containing methamphetamine; transcripts of recorded conversations between conspiracy participants in Mexico and Maldonado; the phone numbers communicated to Maldonado and Mendez; the defendants' cellular and home phone records; and the motel room key recovered from defendant Contreras's vehicle.

During the trial, the district court also allowed Officer Daniel Vasquez to testify concerning two earlier encounters

with defendant Contreras.[3] Officer Vasquez testified that in 1992 he was working as an undercover agent with the Narcotics Covert Investigation team of the San Jose, California Police Department and made two undercover purchases of cocaine from a person known as "Gerardo." The first purchase occurred on January 27, 1992, which involved the use of a "special employee" (SE), or informant, to call an individual to set up a drug buy for the undercover agent. The SE contacted Gerardo and stated that a friend wanted to purchase approximately one half of an ounce of cocaine. Gerardo then met the SE and Officer Vasquez at a local restaurant, where Gerardo got into the back seat of Officer Vasquez's vehicle, and handed the SE a plastic package surrounded by duck tape. Officer Vasquez paid Gerardo $250 for the package which contained 14.87 grams of cocaine. On March 2, 1992, Officer Vasquez contacted Gerardo once again and purchased 27.61 grams of cocaine for $500. Officer Vasquez attempted to make a third purchase from Gerardo but was unable to contact him. He was able to identify Gerardo as Victor Hugo Contreras shortly after the purchases by subpoenaing the phone records for the contact number he was given by the SE. Officer Vasquez was also able to identify Gerardo as Contreras in the courtroom.

On October 12, 2001, after an eight-day trial, Gregorio Macedo was found guilty of three offenses: (1) conspiracy to import 500 grams or more of methamphetamine or mixtures thereof, in violation of 21 U.S.C. § 963; (2) possession with intent to distribute between 50 and 500 grams of methamphetamine or mixtures thereof, in violation of 21 U.S.C. § 841(a)(1); and (3) attempted possession of between 50 and 500 grams of methamphetamine or mixtures thereof, in violation of 21 U.S.C. § 846. His co-defendant, Victor Hugo

---

[3] Before this testimony, the district court instructed the jury that the information conveyed by Officer Vasquez was solely to be used as evidence on the question of intent.

Contreras, was found guilty of conspiracy to import 500 grams or more of methamphetamine or mixtures thereof and possession with intent to distribute between 50 and 500 grams of methamphetamine or mixtures thereof. On September 5, 2002, Macedo was sentenced to 314 months, while Contreras was sentenced to 210 months. The district court also granted each defendant a one point downward departure based on their status as deportable aliens.

The defendants allege several errors on appeal. Defendant Macedo contends that *Apprendi* was violated when: (1) he was sentenced beyond the statutory maximum for schedule III drug violations; (2) the trial court failed to instruct the jury that it was required to find him guilty beyond a reasonable doubt of conspiring/possessing/attempting to possess a specific amount of drugs as opposed to a range of drugs; and (3) the district court sentenced him beyond the statutory maximum by holding him responsible for 799.9 grams of methamphetamine. Macedo also challenges the sufficiency of the evidence presented at trial on all three counts of the indictment. Defendant Contreras only asserts that the trial court abused its discretion by admitting the testimony of Officer Vasquez under F.R.E. 404(b) concerning two prior drug sales. Finally, the government appeals the district court's decision to grant defendant Contreras a one point downward departure based on his status as a deportable foreign national.[4]

## II. ANALYSIS

---

[4] Defendant Contreras's original guideline range of 235 to 293 months was thus reduced to 210 to 262 months and resulted in a sentence of 210 months. The government does not appeal the district court's decision to grant defendant Macedo a one point downward departure, though the trial court applied the same reasoning for each defendant.

## A.  Statutory Maximum Sentence and *Apprendi*

### 1.  Typographical Error in the Indictment

Macedo's primary objection stems from the government mislabeling methamphetamine a schedule III drug (rather than correctly labeling it a schedule II drug) in its indictment. But because the indictment listed the specific drug and quantity charged and the jury found him guilty of conspiring to import, possessing and attempting to possess a specific drug type and amount, the incorrect designation of methamphetamine as a schedule III in the indictment drug does not implicate *Apprendi*.

On July 7, 1971, the Director of the Bureau of Narcotics and Dangerous Drugs, on behalf of the Attorney General, reclassified methamphetamine from a schedule III drug to a schedule II drug based on its high potential for abuse relative to other substances. *See* 36 F.R. 12734, 12735 (July 7, 1971); 21 C.F.R. § 1308.12(d). Title 21 U.S.C. § 811(a) grants the Attorney General the power to reclassify controlled substances. Title 21 U.S.C. § 812(c), which lists the drug classification schedule, classifies methamphetamine as a schedule II drug when it is contained in "any injectable liquid," but classifies methamphetamine as a schedule III drug when it is in any other form. Though previously unaddressed by this court directly, *see United States v. Roya*, 574 F.2d 386, 392-93 (7th Cir. 1978), we now find that the reclassification of methamphetamine as a schedule II substance applies to all forms of methamphetamine in accordance with 21 C.F.R. § 1308.12(d) despite the statute's distinction. *Accord United States v. Gori*, 324 F.3d 234, 240 (3d Cir. 2003) (reasoning that 21 C.F.R. § 1308.12(d) must supercede 21 U.S.C. § 812(c)'s schedule classification as the Attorney General acted pursuant to express authorization and the regulation was properly promulgated); *United States v. Segler*, 37 F.3d 1131, 1133 (5th Cir. 1994); *United States v. Kendall*, 887 F.2d 240, 241 (9th Cir. 1989) (per curiam).

Macedo having been found guilty of 21 U.S.C. § 841(a)(1),[5] was sentenced under section 841(b)(1), which sets the default statutory maximum prison sentence based on the amount and type of controlled substance at issue. The statutory maximum penalty for Macedo's conspiracy charge is life in prison, *id.* at § 960(b)(1)(H),[6] while the statutory maximum penalty for his possession and attempted possession charges is forty years in prison, *id.* at § 841(b)(1)(B)(viii). However, section 841(b)(1)(D) states that any person found guilty of violating section 841(a)(1) as it relates to "any controlled substance in schedule III [. . .] shall [. . .] be sentenced to a term of imprisonment of not more than 5 years. . . ." Macedo, therefore, reasons that because the indictment listed the drug as a schedule III substance, he should have been sentenced to no more than five years imprisonment under section 841(b)(1)(D).

An incorrect designation of the drug schedule in the indictment does not mean there is an *Apprendi* violation when the indictment also lists the specific drug as well as the quantity.[7] In essence, Macedo would have us ignore the

---

[5]  Section 841(a)(1) states that "it shall be unlawful for any person to knowingly or intentionally [. . .] manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance."

[6]  Title 21 U.S.C. § 960(b)(1)(H) mirrors the language of section 841(b)(1)(A)(viii).

[7]  The indictment charged Macedo with three counts. Count one charged that "defendants herein, conspired among themselves and with others known and unknown to the Grand Jury, knowingly and intentionally to import into the United States from a place outside the United States, a controlled substance, namely 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, a Schedule III Narcotic Drug Controlled Substance; In violation of Title 21, United States Code,

(continued...)

word "methamphetamine" and the quantity designation in the indictment, focus solely on the portion of the document which mislabels the schedule classification, and then leap to the conclusion that any sentence beyond the statutory maximum for a schedule III drug (5 years) is a violation of *Apprendi*. This logic is unsound.

*Apprendi* demands that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. In drug sentencing cases, *Apprendi* requires a drug type and amount "sufficient to trigger the higher statutory maximum of § 841(b)(1)(A) or (B) be charged in the indictment and found by the jury." *United States v. Mietus*, 237 F.3d 866, 874 (7th Cir. 2001). Its analysis therefore addresses solely the appropriate decision maker and burden of proof. *United States v. Bjorkman*, 270 F.3d 482, 490-92 (7th Cir. 2001); *United States v. Knight*, 342 F.3d 697, 710 (7th Cir. 2003).

In the case at bar, Macedo was properly indicted and the jury was properly instructed concerning the applicable penalties through the use of the special verdict form. The

---

[7] (...continued)

Section 952(a)." Count three charged that "defendants herein, did knowingly and intentionally possess with intent to distribute a controlled substance, namely approximately 460 grams of methamphetamine or a mixture or substance containing a detectable amount of methamphetamine, a Schedule III Narcotic Drug Controlled Substance; In violation of Title 21, United States Code, Section 841(a)(1)." Count four charged that "defendants herein, did knowingly and intentionally possess with intent to distribute a controlled substance, namely, approximately 470 grams of methamphetamine or a mixture or substance containing a detectable amount of methamphetamine, a Schedule III Narcotic Drug Controlled Substance; In violation of Title 21, United States Code, Section 841(a)(1)."

special verdict form properly tracked the relevant language of 21 U.S.C. § 841(b)(1). The use of this form satisfies the edicts of *Apprendi* in that the drug type and amount sufficient to trigger the higher statutory maximums were found by the jury beyond a reasonable doubt. *Id.* The fact that the indictment incorrectly designated methamphetamine as a schedule III substance had no effect on the validity of the indictment or the subsequent sentence. *See United States v. Trennell*, 290 F.3d 881, 889-90 (7th Cir. 2002) (finding error in indictment harmless where jury determined drug quantity through the use of a special verdict form); *see also United States v. Greenwood*, 974 F.2d 1449, 1472-73 (5th Cir. 1992) (finding that government erroneously labeling methamphetamine a schedule III drug did not set statutory maximum sentence at five years pursuant to § 841(b)(1)(D) and defendant may be sentenced under § 841(b)(1)(A)(viii) and (B)(viii) where indictment stated the specific drug type and quantity range).[8]

Macedo also misconstrues *Apprendi* by arguing that it requires a jury find him guilty beyond a reasonable doubt of importing/possessing/attempting to possess a specific

_____

[8] Macedo is correct that the schedule classification of a drug may be relevant to the maximum statutory penalty determination and may create an *Apprendi* violation if the indictment refers to the drug at issue solely in terms of its schedule classification without referencing the drug type or amount. For example, if the indictment and subsequent verdict form in this case charged Macedo with conspiracy to import/possession/attempted possession "a schedule III drug," then he is correct that the statutory maximum sentence for that crime, under *Apprendi*, would be 5 years as designated by section 841(b)(1)(D). *See United States v. Martin*, 287 F.3d 609, 614-15 (7th Cir. 2002) (reasoning that where indictment and verdict form stated only drug type, cocaine, without stating drug quantity, under *Apprendi* defendant's sentence could not exceed statutory maximum for the smallest amount of cocaine listed in § 841(b)(1)).

amount of methamphetamine as opposed to the drug range used by the trial court in the special verdict form. He also takes issue with the district court's jury instructions. The district court initially instructed the jury that the government need only prove that he possessed/attempted to possess "a measurable amount" of a controlled substance to sustain a guilty verdict of the underlying offenses. The court then, through the use of a special verdict form, directed the jury, if it found him guilty in the first instance, to attribute an appropriate range of drugs to each violation.

We review a district court's choice of jury instruction de novo when the underlying assignment of error implicates a question of law, such as the applicability of *Apprendi*; however, general attacks on jury instructions are reviewed for an abuse of discretion. *United States v. Smith*, 308 F.3d 726, 741 (7th Cir. 2002). In *Smith,* we explicitly held that, even in light of *Apprendi*, drug quantity is not an element of the offense and need not be proven to sustain a guilty verdict under § 841(a)(1). Thus, the "measurable amount" instruction is appropriate as it relates to a finding of guilt of the underlying offenses. *See id.* We also explained that a jury is not required to find a specific drug amount and the use of a drug range in a verdict form is acceptable under *Apprendi* because the elements necessary to trigger the statutory maximum penalty are found beyond a reasonable doubt. *See id.* (reasoning that because 21 U.S.C. § 841(b) speaks in terms of drug ranges, a jury verdict which parallels the statutory language is lawful); *see also Mietus*, 237 F.3d at 874 (finding that jury instruction which asked only that jury find a "measurable amount" without more was insufficient under *Apprendi*).

While we do not espouse the government's "no harm no foul" attitude concerning the typographical error in the indictment, the issue remains whether, in light of the error, Macedo was afforded sufficient notice of the charges against him to prevent any possibility of prejudice. *United States v.*

*Field*, 875 F.2d 130, 133 (7th Cir. 1989). Pursuant to the logic in *Field*, where an error in an indictment does not go to an element of the crime, but rather is typographical in nature, a defendant is not prejudiced. *Id*. Therefore, the improper designation of methamphetamine as a schedule III drug did not prejudice the defendant as he was directed to the applicable statute and afforded proper notice of the charges against him.[9]

### 2.  *United States v. Booker* and Sentencing Based on Judge-Found Facts

While for reasons stated above we reject Macedo's schedule III sentencing argument (asserting that *Apprendi* and the United States Sentencing Guidelines were violated because he was sentenced beyond the statutory maximum for a schedule III substance), we recognize that his *Apprendi* claims do, in light of *United States v. Booker*, 125 S. Ct. 738 (2005), present colorable arguments with respect to the propriety of two enhancements of his sentence based on solely judge-found facts—namely, the drug quantity and obstruction of justice enhancements.

"[T]he Sixth Amendment as construed in *Blakely* [*v. Washington*, 124 S. Ct. 2531 (2004)] does apply to the Sentencing Guidelines." *Booker*, 125 S. Ct. at 746. Accordingly, under the formerly mandatory regime, "[a]ny fact (other than a prior conviction) which is necessary to support

---

[9] To the extent Macedo is arguing that the jury instructions amounted to a *de facto* amendment of the indictment, his assertion is foreclosed by *Field*. The designation of methamphetamine as a schedule III drug had no substantive effect on the indictment as it is a fact that "need not be proven even if alleged, [. . .] and the jury could have been instructed to ignore. . . ." *Id.* at 133 (quoting *United States v. Skelly*, 501 F.2d 447, 453 (7th Cir. 1974)).

a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." *Id.* at 756.

### a. Drug Quantity Enhancement

Macedo first argues that the district court erred by enhancing his sentence based on a factual finding made solely by the sentencing judge with respect to the purity and quantity of methamphetamine involved in his offenses. Because this matter appears before us on direct review, and because Macedo raised an objection to his sentence based on *Apprendi v. New Jersey*, 530 U.S. 466 (2000) before the district court (*see* Defendant's Objection's [sic] to Presentence Investigation Report at 2-3, *United States v. Macedo*, filed July 1, 2002 (No. 02-3536)), our standard of review is plenary. *See Booker*, 125 S. Ct. at 769.

Pursuant to special verdict forms, the jury here found Macedo guilty beyond a reasonable doubt of, among other charges, (1) "conspiracy to import 500 grams or more of mixtures containing a detectible amount of methamphetamine," (2) possession of "50 grams or more, but less than 500 grams of mixtures containing a detectible amount of methamphetamine," and (3) attempt to possess "50 grams or more, but less than 500 grams of mixtures containing a detectible amount of methamphetamine." Thus, in total the jury found that Macedo's offenses of conviction involved a total of 600 or more grams of mixtures containing methamphetamine. Under *Booker*, these findings proven to the jury beyond a reasonable doubt provide a legitimate basis upon which a judge may impose sentence.

We turn now to the district court's application of the Sentencing Guidelines. In this case, we analyze the district court's use of the Guidelines not to assess the propriety of their application—for after *Booker* they serve no longer as

a mandatory prescription but rather as an advisory refer-
ence, *Booker*, 125 S. Ct. at 756-57—but rather to ascertain
those facts upon which the district court felt authorized, even
obliged, to base its sentence of Macedo. The Guidelines rec-
ognize various qualities of methamphetamine—"meth-
amphetamine," "methamphetamine (actual)," and "Ice." *See
generally* U.S.S.G. § 2D1.1.[10] These distinctions are of
appreciable significance under the Guidelines' regime, because
the quality of methamphetamine with which a defendant is
found to have been involved can help determine the base
offense level assigned to the defendant for purposes of calcu-
lating his sentence. Indeed, the base offense level is a factor
upon which Guidelines sentencing is predominantly based.

As the findings catalogued above reveal, the jury found

---

[10] Notes to the Section 2D1.1(c) Drug Quantity Table define the
terms "methamphetamine," "methamphetamine (actual)," and
"Ice":

   (A)   Unless otherwise specified, the weight of a controlled
         substance set forth in the table refers to the entire
         weight of any mixture or substance containing a
         detectible amount of the controlled substance [i.e.,
         "Methamphetamine"]. . . .

   (B)   The term[ ] . . . "Methamphetamine (actual)" refer[s]
         to the weight of the controlled substance, itself,
         contained in the mixture or substance. For example,
         a   mixture   weighing   10   grams   containing
         [Methamphetamine] at 50% purity contains 5 grams
         of [Methamphetamine] (actual). In the case of a mix-
         ture or substance containing . . . methamphetamine,
         use the offense level determined by the entire weight
         of the mixture or substance, or the offense level de-
         termined by the weight of the . . . methamphetamine
         (actual), whichever is greater. . . .

   (C)   "Ice," for the purposes of this guideline, means a mix-
         ture or substance containing d-methamphetamine
         hydrochloride of at least 80% purity.

Macedo guilty of offenses involving 600 grams or more of plain old *"methamphetamine"*—not "methamphetamine (actual)" or "Ice." Had the district court relied solely on those jury findings, Macedo's base offense level under the Guidelines would have been 32. *See* U.S.S.G. §§ 2D1.1(a)(3) and 2D1.1(c)(4) (providing a base level of 32 for offenses involving "[a]t least 500 G but less than 1.5 KG of Methamphetamine"). The district court, however, went further. At sentencing it found by a preponderance of the evidence that the actual weight of the charged mixtures was 878.8 grams (based on uncontested results of government lab analysis) and that 91% of those mixtures, or 799.7 grams, constituted "methamphetamine (actual)." Based on these supplemental factual findings, the district court sentenced Macedo pursuant to Sections 2D1.1(a)(3) and 2D1.1(c)(4) of the Guidelines, which carries with them a base offense level of 36 for offenses involving "at least 500 G but less than 1.5 KG of *Methamphetamine (actual)*, or at least 500 G but less than 1.5 KG of 'Ice.'" (emphasis added). Thus, based on solely judge-found facts, the district court increased Macedo's base offense level by four levels (from 32 to 36). Such sentencing in reliance on supplemental facts not admitted by Macedo or proven to the jury beyond a reasonable doubt—namely, involvement with 799.7 grams of methamphetamine (actual) as opposed to involvement with merely 600 grams of methamphetamine—squarely offends our new understanding of the Sixth Amendment as divined by *Booker*.

### b.   Obstruction of Justice Enhancement

Macedo also argues that the district court erred by imposing a two-level increase in calculating his adjusted offense level—thereby enhancing his ultimate sentence—based on an obstruction of justice finding made solely by the sentencing judge. Despite the government's arguments to the contrary, Macedo has not waived this argument by failing to argue the obstruction enhancement on appeal. In a direct

appeal, a defendant might preserve his *Blakely* and *Booker* arguments by raising them in subsequent filings. *See United States v. Henningsen*, 387 F.3d 585, 591 (7th Cir. 2004) ("Although [the defendant] did not raise the issue of constitutionality in his brief, he made notice of the *Blakely* and *Booker* decisions in a subsequent filing and raised the issue during argument. In light of the uncertainty surrounding this issue and the questionable constitutionality of [the defendant's] sentencing enhancement, we do not find that [the defendant] has waived his right to challenge the validity of the district court's sentencing enhancement"); *see also United States v. Pree*, 384 F.3d 378, 396 (7th Cir. 2004) ("Given the precedent in this circuit prior to *Blakely*, we think it would be unfair to characterize [the defendant] as having waived a challenge to the validity of her sentencing enhancement."). Macedo has done so here by virtue of filing a petition for rehearing.

Macedo has, however, forfeited his appeal of the district court's imposition of the obstruction enhancement by failing to raise the argument before the court below. *United States v. Olano*, 507 U.S. 725, 731-32 (1993) (" 'No procedural principle is more familiar to this Court than that a constitutional right,' or a right of any other sort, 'may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.' ") (quoting *Yakus v. United States*, 321 U.S. 414, 444 (1944)). Accordingly, and in contrast to his objection to sentencing based on the improper imposition of a drug quantity enhancement, we review Macedo's challenge to the obstruction of justice enhancement for plain error. *United States v. Paladino*, 401 F.3d 471, 481 (7th Cir. 2005). "Under [the plain error] test, before an appellate court can correct an error not raised at trial, there must be (1) 'error,' (2) that is 'plain,' and (3) that 'affect[s] substantial rights.' " *United States v. Cotton*, 535 U.S. 625, 631 (2002) (quoting *Johnson v. United States*, 520 U.S. 461, 466-67 (1997)). "If all three

conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Id.* (quoting *Johnson*, 520 U.S. at 467).

Enhancement of Macedo's sentence based on facts not admitted by the defendant or proven to a jury beyond a reasonable doubt does, under the new *Booker* regime, constitute "error." Furthermore, that error was plain. " 'Plain' is synonymous with 'clear' or, equivalently, 'obvious.' " *Olano*, 507 U.S. at 734. At the time of Macedo's sentencing, September 11, 2002, the Sixth Amendment and the reasoning of *Apprendi* were not yet understood to apply to the Federal Sentencing Guidelines. *Cf. Blakely v. Washington*, 124 S. Ct. 2531 (2004) (issued on June 24, 2004); *Booker*, *supra* (issued on January 12, 2005). However, "where the law at the time of trial was settled and clearly contrary to the law at the time of appeal[,] it is enough that an error be 'plain' *at the time of appellate consideration.*" *Johnson*, 520 U.S. at 468 (emphasis added). Thus, while the propriety of imposing sentence enhancements free from the constraints of the Sixth Amendment was at the time of Macedo's sentencing settled, that practice is today and at the time of this appeal clearly contrary to the law as set forth by *Booker*. Accordingly, the error of enhancing Macedo's sentence based on findings of obstruction of justice found solely by the sentencing judge is plain.

As we recently noted in *Paladino*, 401 F.3d at 481, the difference between the third and fourth prongs of the plain error standard "is not entirely clear." While the third element requires the error to have been "prejudicial," in that it "affected the outcome of the district court proceedings," *Olano*, 507 U.S. at 734, the fourth element requires that the uncorrected error be "intolerable," or result in a "miscarriage of justice," *Paladino*, 401 F.3d at 481 (citing cases). Indeed, the third prong feeds into the fourth, in that

there cannot be a miscarriage of justice without prejudice to the defendant. Conversely, "[a]n error can be prejudicial without being intolerable, because it might be apparent that a retrial or a resentencing would lead to the same result." *Id.* Here we can and have predetermined that if the defendant has been prejudiced by an illegal sentence, then allowing that illegal sentence to stand would constitute a miscarriage of justice. *Id.* at 483 ("It is a miscarriage of justice to give a person an illegal sentence that increases his punishment, just as it is to convict an innocent person."); *United States v. Pawlinski*, 374 F.3d 536, 541 (7th Cir. 2004) ("[T]he entry of an illegal sentence is a serious error routinely corrected on plain error review."). But what we cannot do on plain error review is divine with requisite certainty whether the district court, operating under broader post-*Booker* discretion, would have sentenced the defendant any differently. Thus, to resolve this dilemma and complete our plain error analysis, normally we, "while retaining jurisdiction of the appeal, order a limited remand to permit the sentencing judge to determine whether he would (if required to resentence) reimpose his original sentence." *Paladino*, 401 F.3d at 483-84.

### c.  Disposition

We need not, however, engage the district court in such an intermediate inquiry here. Because we find grounds for remand under our broader standard of plenary review based on the drug quantity enhancement, this case may be remanded to the district court without reservation. Accordingly, we vacate Macedo's sentence and remand his case for resentencing consistent with this opinion and the Supreme Court's recent decision in *Booker*.

## B.  Sufficiency of the Evidence

Macedo contends that the government failed to present sufficient evidence to support his conviction on all three charges in the indictment. On appeal, we review the evidence in the light most favorable to the prosecution and will reverse a jury verdict only when the record "is devoid of any evidence, regardless of how it is weighed, from which a jury could find the defendant[ ] guilty beyond a reasonable doubt." *United States v. Hernandez*, 330 F.3d 964, 976 (7th Cir. 2003) (citing *United States v. Johnson*, 26 F.3d 669, 684 (7th Cir. 1994)). While a sufficiency of the evidence claim is not untenable on appeal, it is nevertheless a steep hill to climb. *Id.* (citing *United States v. Frazier*, 213 F.3d 409, 416 (7th Cir. 2000)).

In essence, Macedo takes issue with the propriety of relying on coconspirator testimony to support his convictions. He argues that Maldonado and Mendez's testimony was conflicting, inconsistent and biased, and absent the testimony, there is no evidence linking him to this conspiracy beyond his mere presence at the airport. However, the conflicts or inconsistencies Macedo highlights are immaterial.[11] With regard to Maldonado and Mendez's potential bias, this court has held that "[u]nless testimony is inherently unbelievable, a guilty verdict may be based on the testimony of a coconspirator testifying pursuant to a plea agreement: Credibility is for the jury, not this court to determine." *United States v. Jewel*, 947 F.2d 224, 231 (7th Cir. 1991) (internal quotations and citations omitted).

---

[11] For example, he points to discrepancies between Mendez's grand jury testimony, where he stated that he was to receive the full $1500 from Contreras and Macedo in the United States, with his in court testimony, where he stated that he was to be paid in two installments of $750. He also suggests Maldonado's testimony is unreliable given Maldonado's statements to the grand jury that he exchanged the methamphetamine-laden shoes in Contreras's car as compared to direct testimony where he stated the exchange occurred in Contreras's home.

Reviewing the record, we do not find that Maldonado and Mendez's testimony was "inherently unbelievable." *Id.* Quite the contrary, it was corroborated by the direct evidence presented at trial. The government recovered Mendez's methamphetamine-laden shoes from the motel room rented by Macedo. Agents observed the meeting between the four men on January 20, 2001, the day of the arrest. Agent Michael Heene witnessed Maldonado place a call to Contreras and Macedo which led to the meeting at O'Hare Airport. Accordingly, we will not disregard the testimony of his coconspirators.

Taking all the evidence presented to the jury into account, it had ample evidence to support its guilty verdict on all three charges in the indictment. To sustain a conspiracy conviction, the government must prove that "two or more persons joined together for the purpose of committing a criminal act and that the charged party knew of and intended to join the agreement." *United States v. Adkins*, 274 F.3d 444, 450 (7th Cir. 2001). Further, a jury is not limited to direct evidence (though here the record contains a plethora) and may "find an agreement to conspire based upon circumstantial evidence and reasonable inferences drawn [from] the relationship of the parties, their overt acts, and the totality of their conduct." *United States v. Turner*, 93 F.3d 276, 282 (7th Cir. 1996) (quoting *United States v. Mojica*, 984 F.2d 1426, 1432 (7th Cir. 1993)).

The jury heard the following evidence: (1) Macedo traveled to the airport to pick up Mendez and Maldonado; (2) Macedo paid for the new shoes Mendez exchanged for the shoes containing the drugs; (3) he paid for the motel room from which the drugs were subsequently recovered; (4) he told Maldonado that he would purchase his return ticket to Mexico; and (5) his cellular phone number was given to both coconspirators. *See United States v. Gutierrez*, 978 F.2d 1463, 1469 (7th Cir. 1992) ("[A] single act will suffice if the circumstances permit the inference that the presence or act was intended to advance the ends of the conspiracy."). Thus,

Macedo's involvement traversed the line from mere presence to participant. *See United States v. Albarran,* 233 F.3d 972, 977 (7th Cir. 2000) (reasoning that a government need only prove a "participatory link" between the defendant and the conspiracy). The jury had sufficient evidence to find that Macedo knew of and intended to enter into an agreement with Contreras, Maldonado and Mendez to engage in the criminal act of importing methamphetamine.

The evidence also supports the jury's verdict with regard to Macedo's possession with intent to distribute and attempted possession charges. Under 21 U.S.C. § 841(a)(1), the government must prove that Macedo (1) knowingly or intentionally possessed the methamphetamine, (2) possessed it with the intent to distribute it, and (3) knew that methamphetamine was a controlled substance. *United States v. Griffin,* 194 F.3d 808, 816 (7th Cir. 1999). Mendez testified that upon his arrival in the United States, he gave the shoes containing the methamphetamine to Macedo who determined it was safer to leave the shoes in the motel room which Macedo secured. Thus, the jury could have reasonably found that Macedo actually possessed the drugs, as well as constructively possessed them. *See United States v. Perlaza*, 818 F.2d 1354, 1360 (7th Cir. 1987) (finding that evidence of registration and control over a hotel room containing drugs may be sufficient to find constructive possession of drugs); *see also United States v. Garrett,* 903 F.2d 1105, 1112 (7th Cir. 1990) (holding that constructive possession is sufficient to sustain a conviction under 21 U.S.C. § 841(a)(1)). Furthermore, the jury could have reasonably found that Macedo intended to distribute the methamphetamine based on the large quantity seized and the testimony of his co-conspirators.

## C. Admission of Prior Bad Act Evidence Under F.R.E. 404(b)

Defendant Contreras challenges the decision of the district court to admit the testimony of Officer Vasquez concerning two prior drug sales which occurred in 1992 as dissimilar and too remote in time. We review a district court's decision to admit evidence pursuant to Rule 404(b) of the Federal Rules of Evidence for abuse of discretion. *United States v. Anifowoshe,* 307 F.3d 643, 646 (7th Cir. 2002). Rule 404(b) prohibits the use of a defendant's prior bad acts as propensity evidence while permitting its use to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. Evid. 404(b).

We have long recognized that the permissible use of prior bad act evidence to prove intent or lack of mistake may have the potential impermissible side effect of allowing the jury to infer criminal propensity. *See United States v. Beasley,* 809 F.2d 1273, 1278 (7th Cir. 1987) ("When the same evidence has legitimate and forbidden uses, when the introduction is valuable yet dangerous, the district judge has great discretion."). To address these twin concerns, we have reasoned that evidence is properly admitted if the government is able to show that:

> (1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged, (2) the evidence shows that the other act is similar enough and close in time to be relevant to the matter in issue, (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act, and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.

*United States v. Wash,* 231 F.3d 366, 370 (7th Cir. 2000) (quoting *United States v. Wilson,* 31 F.3d 510, 514-15 (7th Cir. 1994)). Furthermore, when a defendant is charged with a specific intent crime, such as possession with intent to distribute, we have reasoned that evidence of past action is

probative if used to establish an essential element of the crime charged. *Id.*; *United States v. Long*, 86 F.3d 81, 84 (7th Cir. 1996).

Though this is a close case, we cannot find that the district court abused its discretion by admitting the testimony of Officer Vasquez. Contreras correctly points out that there is a nine-year gap between the 1992 drug sales and the 2001 charges. While we acknowledge that nine years is a substantial amount of time, the temporal proximity of the prior acts to the current charge is not alone determinative of admissibility. *See United States v. Wimberly*, 60 F.3d 281, 285 (7th Cir. 1995) (admitting prior bad act evidence that occurred thirteen years prior to charge when evidence was highly reliable and relevant to credibility); *United States v. Mounts*, 35 F.3d 1208, 1214 (7th Cir. 1994) (permitting admission of drug purchase which occurred seven years prior to arrest to prove element of intent).

Defendant's argument that the events are not sufficiently similar because the 1992 transaction involved cocaine while his current conviction involves methamphetamine is also unsupported by this circuit's precedent. The similarity inquiry focuses on the purpose for which evidence is offered. *Long*, 86 F.3d at 84. The 1992 cocaine sales were offered to prove Contreras's intent to possess distribution amounts of illicit drugs. *See United States v. Hernandez*, 84 F.3d 931, 935 (7th Cir. 1996) (finding sufficient similarity when different drugs are at issue because both instances involved "distribution amounts of drugs and illicit transport"); *Wash*, 231 F.3d at 370 (finding sufficient similarity when prior bad acts and current charge both involve "possessing distribution amounts of drugs").

The evidence submitted by Officer Vasquez was unquestionably reliable. The record also reveals the district court's thorough discussion of Contreras's theory of the case, i.e., that he lacked the intent to enter into a conspiracy to im-

port or possess methamphetamine or the knowledge that one existed and was simply present at the airport that day by happenstance. (During closing arguments his attorney went so far as to call him a "dupe" or fall guy.) This theory coupled with the government's need to prove an essential element of the case, i.e., that the defendant acted with the requisite specific intent, supports the district court's decision to admit the prior bad acts.

Further, any prejudicial effect on the defendant was lessened by the trial court's limiting instruction that the evidence was solely to be used to evaluate the issue of intent. *United States v. Tringali*, 71 F.3d 1375, 1379 (7th Cir. 1995). Finally, were we to err on the side of caution and deem this testimony's admission in error, it would undoubtedly be harmless as the weight of the evidence against Contreras was overwhelming. *See United States v. Coleman*, 179 F.3d 1056, 1062 (7th Cir. 1999).

## D.  Downward Departure Based on Alien Status

The government appeals the district court's decision to grant defendant Contreras a one point downward departure based on its finding that his alien status and deportability would cause the conditions of confinement to be more "onerous." The district court found that Contreras would suffer a substantial hardship because the Bureau of Prison's (BOP) placement policy for deportable aliens "limits the discretion of the Bureau of Prisons to take into account among other things factors that would warrant more humanitarian designations like family and other matters." Sent. Trans. at 6-16.[12]

---

[12] Contreras argues that the district court made the following findings: (1) Contreras would not be able to serve any time in a
(continued...)

We review a district court's decision to grant a downward departure de novo. *United States v. Mallon*, 345 F.3d 943, 945-47 (7th Cir. 2003) (discussing the retroactive application of section 401(d) of the Prosecutorial Remedies and Tools Against the Exploitation of Children Today Act of 2003 (PROTECT Act), Pub. L. No. 108-21, 117 Stat. 650, which amended 18 U.S.C. § 3742(e)'s prior standard of review); *see also United States v. Griffin*, 344 F.3d 714, 718 (7th Cir. 2003) (discussing effect of PROTECT Act on district court's decision to upward depart). This court has held that "the defendant's status as a deportable alien is relevant only insofar as it may lead to conditions of confinement, or other incidents of punishment, that are *substantially more onerous* than the framers of the guidelines contemplated in fixing the punishment range for the defendant's offense." *United States v. Guzman*, 236 F.3d 830, 834 (7th Cir. 2001) (emphasis added).

We then further explained that it is permissible "in exceptional circumstances" to take into account a defendant's alienage when assessing whether his status makes his conditions of confinement "harsher by disentitling a defendant to serve any part of his sentence in a halfway house, minimum security prison, or intensive confinement center, so that the same nominal prison sentence would be, quite apart from the sequel of deportation, a more severe punishment than if the defendant were a citizen." *Id.* More recently, we explained that downward departures based solely on an

---

[12] (...continued)
halfway house; (2) he would not be eligible for a minimum security facility because he would have to be sent to one of three facilities able to conduct deportation hearings; and (3) the high likelihood he would be incarcerated in an INS camp which is "much harder time." After reviewing the record, we find that the district court made no such findings. Rather these points were advanced by Contreras in his argument to the court below.

alien's loss of "end-of-sentence modifications," such as halfway house placement, "cannot be viewed as a term of imprisonment 'substantially more onerous' than the guidelines contemplated in fixing a punishment for a crime." *United States v. Meza-Urtado*, 351 F.3d 301, 305 (7th Cir. 2003); *but see Mallon*, 345 F.3d at 949 ("A prisoner who is ineligible for transfer, and as a result of alienage becomes ineligible for transitional release, suffers a real disadvantage.").

The government is correct that the district court based its decision on the BOP's policy which places alien prisoners in certain facilities. Any defendant, citizen or alien, may be placed far from loved ones and family and thus this circumstance is not substantially more onerous than contemplated by the guidelines. Furthermore, application of this logic would amount to a *per se* downward departure for any deportable alien, which standing alone, is an impermissible basis for granting a downward departure. *United States v. Gallo-Vasquez*, 284 F.3d 780 (7th Cir. 2002) (remanding based on district court's failure to make a sufficient showing that defendant's situation was "exceptional"). Contreras must therefore be resentenced.

### III. CONCLUSION

For the reasons stated above, judgment of defendant Macedo's conviction is AFFIRMED, however, his sentence is VACATED and his case is REMANDED for resentencing consistent with this opinion. Defendant Contreras's judgment of conviction is also AFFIRMED, however, his sentence too is VACATED and his case is REMANDED for resentencing consistent with this opinion.

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*

USCA-02-C-0072—4-14-05